ENOCH G. HEDGES *vs*. JACOB PRICE.

IDEM *vs*. SAMUEL MICHAEL.

IDEM *vs*. LEWIS LUTMAN.

July Term, 1867.

1. The late Rebellion of 1861 was a civil war.

2. During the Rebellion, the Government of the United States never acknowledged or recognized the so-called Confederate States of America as a political power, or as having right or authority to command the obedience of any one. Therefore, all persons engaged in the rebellion are liable for any wrong or injury done by them whilst so engaged.

3. An act may be a public offense and punishable as such, and yet the right to damages by any one injured still exists; and a person who engaged in the rebellion is liable to private individuals for acts of trespass by him committed whilst in the rebellion. And this right to recover damages for the injury to the private party exists, notwithstanding the person who committed the trespass has been pardoned by the Executive department of the United States Government.

These causes arose in *Berkeley* county, in July and August, 1865. They were all heard at the December term, 1865 of the circuit court.

The action was trespass for taking and carrying away the goods of the plaintiffs respectively. The defendant filed in each case, the plea of not guilty, and three special pleas in justification, alleging in substance, that at the time of the trespass he was in the service of the government of the Confederate States of America, and took the property under orders from his superiors for the use of the Confederate army; and that since the taking of the property he had subscribed

[*]See page 187.

.Judge GEORGE LOOMIS of the VI circuit was called to the bench.

to the oath of amnesty under the proclamation of the President of the United States, of May 29th, 1865; to which latter pleas the plaintiffs demurred, and upon a joinder, the demurrers were sustained, and judgment entered against defendant for the value of the property; execution was suspended for forty days, on the usual conditions of giving bond, to allow the party to obtain a writ of supersedeas from this court. A supersedeas was allowed in each of the cases, and they were heard together, and argued at the January term, 1865, of this court, and held under advisement until the present term.

*Charles J. Faulkner* appeared for the plaintiff in error, and the substance of his argument, in closing the case, follows here the argument of the attorneys' for the defendants in error.

*Stanton & Allison* for the defendants in error, after eliminating the points made on the ground of the pleas being defective, (which the court did not consider, regarding the question determined by it as decisive of the case) made substantially the following argument:

We now propose to consider the question whether the rebel government was a government *de facto,* or belligerent power which entitled its officers and soldiers to such belligerent rights as are recognised by international law in public international war. This is the stronghold and citadel of the defence.

It seems to us that much of the confusion and uncertainty that exists in relation to this subject, results from a misapprehension of the nature and objects of what is known as the " Law of Nations."

It must be constantly borne in mind that the family of nations recognise no common sovereign with power to make laws for their government, or to carry them into execution, or inflict penalties for their violation.

The whole of the international code therefore must in the common law sense of the term be *lex non scripta.*

It is made up of the customs and usages of nations, the dicta of approved elementary writers, and the decisions of courts of established international reputation.

"The *jus gentium*, law of nations, is proved in the same manner as the unwritten civil law, by constant usage, and the testimony of those who have made it their study." 1 Grotius, chap. 1, sec. 14, page 19.

It deals only with nations in their corporate or sovereign capacity. It takes no cognisance of the acts of individuals, except as integral parts of the nation to which they belong.

It is no matter whether a man is personally a friend or an enemy to the country and government to which he belongs, or is in favor of, or opposed to the war in which it may be engaged; he is responsible for its sins, and may be punished for its transgressions.

If his property is found upon the high seas, it is subject to capture and condemnation by the enemy of the nation to which he belongs, although he may personally sympathize with and give aid and comfort to the government by which the capture is made.

It follows that inasmusch as international law deals only with sovereignties, it can only address itself to the properly authorised and accredited representations of those sovereignties. It cannot go behind them and deal directly with the people or persons occupying subordinate positions.

If a citizen or subject of one country is injured by the citizens or subordinate authorities of another, in violation of the law of nations, the injured party or his government, does not proceed personally against the party who committed the injury; but it appeals to the government of the party by whom the injury was committed. If the government to whom such complaint is made recognises its justice, it is bound to release.

If it denies that the complaining party has any just ground of complaint, the subject becomes a matter of negotiation between the two governments, and if redress is finally insisted on one side and denied on the other, it is the cause of war between the two nations.

If an individual is arrested or called in question for an act done by his government, his proper mode of availing himself of it, is to appeal to his government to assume the responsibility of the act, and interpose its authority with the sovereign in whose courts he is held to relieve him from liability and hold his government responsible.

"For anything done in violation of the laws of war, the individual is liable to punishment. So also, for any act within the rules of war not authorized or assumed by his government as the act of the State.

"The distinction between the two cases is manifest, and should not be lost sight of; the latter is punished by the rules of the civil law, while the former is an offence against the law of nations punishable only by the laws and usages of war.

"The taking of property and of human life in the one case would be robbing and murder punishable by the local laws, while in the other, the same acts might be justifiable as the lawful exercise of belligerent rights under the law of nations. Halleck's In. Law, page 348, sec. 31."

This was the course pursued in the *McLeod* case in New York. *McLeod* was indicted in Niagara county New York, for murder and arson in taking the steamer Caroline from Schlosser Harbor on the American side of the Niagara river, and setting her on fire sending her over the falls with one or more persons on board. *McLeod* alleged that he acted under the orders of the British government in Canada. The British government assumed the responsibility of the act, and demanded the release of *McLeod* from the *government of the United States*. But he was in the custody of the authorities of the State of New York.

The government of the United States applied to the government of the State of New York to surrender or transfer him to the authorities of the United States. New York refused.

The Attorney General of the United States was sent to Lockport to attend the trial, and set up "belligerent rights" on behalf of the United States, in defense of *McLeod*.

The New York court overruled the defence, and determined to try him, and convict him if found guilty, and then let the Governor of New York, and the President of the United States, take the responsibility of bringing on a war by hanging him, or preventing it by pardoning him. The jury relieved the Government of the difficulty by finding him not guilty.

If the owner of the *Caroline* had brought a civil action against *McLeod* for the value of the boat, the Government might have avoided trouble with Great Britain by paying for the boat. *People* vs. *McLeod*, 25 Wendell, 483. But the court in New York would no more have allowed "belligerent rights" to be set up in bar of a civil action, than it did in bar of the criminal prosecution. Halleck, page 302, sections 18, 19, 20, 21, 22.

This court is administering justice to the people of West Virginia, according to the laws of West Virginia.

By what authority may the Government of the United States, or any other government, come here and release one citizen of the State from a civil liability to another? This defendant is liable in this action, unless he is exempt from liability by some law not heretofore known to your jurisprudence. It is not known to the statute or common law of the State, or of the United States.

But it is claimed that the Congress and Government of the United States has so dealt with the late rebellion, as to exempt those who were engaged in it, from civil liabilities to which they would otherwise have been subject. If so, let them go to Congress and the Government of the United States for relief. And if Congress or the Government of the United States considers them entitled to relief, let them pay our judgment, and that will be an end of the matter.

In the case of *Mitchell* vs. *Harmoney*, 13 Howard, *Mitchell* defended, for that he was in the military service and acting under orders in taking the property. The court held that this would not protect him. He went to Congress, and got an appropriation to pay the judgment.

In cases arising between proper belligerent parties,—independent and established Governments,—there is no difficulty in applying the principles of international law, through the agency of the sovereignties interested in the question. But the attempt to apply them to a defunct rebellion, makes confusion worse confounded. The first thing a party does who wants to avail himself of the principle of international law, is to call upon the Government. But calling upon this rebel government is like "calling spirits from the vasty deep;" it wont come. It is gone; has evaporated into thin air, and can no longer afford protection to anybody.

Whether the rebel government was a "belligerent power" which could afford protection to persons acting under its authority, is a question which the Government of the United States alone can decide, and over which this court can take no jurisdiction.

The international Code is frequently called the "voluntary" law of nations. It is so called, because there is no sovereign over nations that has power to impose any law upon them against their will. There is no court in which suit can be brought, judgment rendered and execution issued against a nation, for violation of the law of nations. The sovereign power of every nation determines for itself how far it will be bound by the law of nations, and how far it will disregard it.

It is true, that if any nation disregards that law, it gives just cause of war to the nation injured by it. It may also bring down upon it the condemnation of the whole family of nations. Still if a nation confident in its own strength and power, chooses to risk a war, or set at defiance the moral sense of the civilized nations of the earth, it has power to do so. Hence, sovereign rights are necessarily paramount and superior to belligerent rights. Therefore, if a nation in the exercise of its municipal sovereignty should pass a law in violation of the law of nations, or adopt a policy in violation of that law, by its properly constituted authorities, the courts would obey the laws, and carry out the policy of the municipal sovereignty whose

commission they hold. This is not only the manifest result of the principle on which belligerent rights rest, but it is abundantly sustained by authority. In the case of *Rose* vs. *Himely*, 4 Cranch, 272, Chief Justice Marshall, in delivering the opinion of the court, says: "It is not intended to say that belligerent rights may not be superadded to those of sovereignty. But admitting that a sovereign who is endeavoring to reduce his revolted subjects to obedience to possess both sovereign and belligerent rights, and to be capable of acting in either character, the manner in which he acts must determine the character of the act. If as a legislator he he ordains a law for the punishment of certain offenses which is to be applied by the courts, the nature of the law and of the proceedings under it will decide whether it is an exercise of belligerent rights or exclusively of sovereign power; and whether the court in applying this law to particular cases, acts as a prize court, or as a court enforcing municipal regulations. It must be remembered, however, that every insurrection or rebellion is by no means a public war, and a State which recognizes it as such, does so under the responsibilities which are imposed by the laws of international comity. It should also be remarked that in such cases belligerent rights may be superadded to those of sovereignty; that is, the contending parties may exercise belligerent rights with regard to each other and to neutral powers, while at the same time the established government may exercise its rights of sovereignty, in punishing by its municipal laws, individuals of the insurgent or revolting party, as rebels and traitors." Halleck's In. Law, page 344, section 25.

In the opinion of the court in the Prize cases, 2 Black, 673, Judge Grier says: "Now it is a proposition never doubted, that the belligerent party that claims to be sovereign, may exercise both belligerent and sovereign rights. Wars of insurrection and revolution are in one sense, civil wars." * * * "Each party in such case is usually entitled to the rights of war as against each other, and also with neutrals. Mere rebellions, however, are exceptions to

this rule, as every government treats those who rebel against its authority according to its own municipal laws and without regard to the general rules of war which international jurisprudence establishes between sovereign States." Halleck's In. Law, p. 323, sec. 9. This settles the question that while the parties to a civil war may acquire belligerent rights, the party claiming to be sovereign loses none of its sovereign rights. Thus while Congress or the President might in the exercise of their belligerent powers, provide for blockading the rebel ports, and for the capture and condemnation of their property on the high seas as prizes of war, they might at the same time provide for the punishment of the rebels for treason, murder, arson or robbery, for acts done in the prosecution of the rebellion.

The acquisition of belligerent rights, therefore, does not extinguish, merge or suspend the sovereign rights of the party claiming to be sovereign. "All other conditions of violence, short of war declared by Congress, are to be redressed by the courts." *Luther* vs. *Borden*, 7 Howard, 74; dissenting opinion of Judge Woodbury.

We are aware that Vattel says, in speaking of a civil war that: "Things being thus situated, it is evident that the common laws of war, those maxims of humanity, moderation and probity which we have enumerated and recommended, are to be observed on both sides." Vattel, Book 3, chap. 18, sec. 294. It is assumed that these rules are to be applied by the courts without regard to the will of the municipal sovereignty to which they belong.

This is an error. And this error lies at the foundation of the defence, and when it is exposed and exploded, the defence is gone.

The true view of the subject will be found in Judge Cadwalader's charge to the jury in the case of the *United States* vs. *Smith*, who was tried for piracy at the October Term, A. D., 1861, of the circuit court of the United States for the Eastern District of Pennsylvania. In speaking of the application of the principles of international law to a civil

war, he says: "But some writers on public law have dis-
cussed the subject as if such civilized modern usages were
founded in rules of legal right rather than in considerations
of mere policy.   I therefore think it my duty to state that
such usages, however commendable, are not in a civil war
founded in any rules of absolute legal right, but are meas-
ures of governmental policy.   The question of their obser-
vance depends upon the decision of the legislative or exec-
utive departments of the government, *not upon the opinions
of its judicial organs.*   Thus courts and juries have with
such questions no proper concern, certainly none that should
influence the finding of a verdict.   The jury who find a
defendant guilty may, indeed, recommend him to mercy.
But such recommendation, though always respectfully con-
sidered, is in law no part of the verdict itself."

Again, in another part of his charge the same judge says:
"An established government may prosecute hostilities
against its enemies in a civil war in like mode as against
its foreign enemies in a national war, and for certain pur-
poses with like effects.   For example, vessels captured in
the present civil war may be confiscable in prize courts of
the United States, and captured persons may be detained as
prisoners of war.   Moreover, in all wars, national as well
as intestine, innocent and harmless inhabitants of hostile
districts, in common with authors and abettors of the war,
become involved in its calamities.   These results, when
produced by a civil war, do not alter its legal character.
*They do not convert it into a foreign or national war.*   In a civil
war, however organized and systematic the hostilities pros-
ecuted by an established government, its enemies may, when
captured, be liable as traitors or as pirates, to prosecution
in its courts of justice."

This is the only principle upon which the municipal sov-
ereignty of a nation can be sustained, or upon which writers
on international law can be made consistent with themselves.
For they all agree with Vattel that a civil war must be con-
ducted upon the same principles, and that the parties to it
have the same belligerent rights as the parties to an inter-

national war. And yet Vattel says (and all the writers on international law agree with him) that: "A sovereign having conquered the opposite party and reduced it to submit and sue for peace, he may *except from the amnesty* the authors of the trouble, and the heads of the party; may bring them to a legal trial, and on conviction, punish them." Vattel, book 3, chap. 18, sec 294.

Punish them for what? Why for acts of hostility committed during the war. For treason and piracy, as Judge Cadwalader says. But who ever heard of officers and soldiers in an international war being punished for offences committed in the prosecution of a war? The very essence of belligerent rights is to protect the parties engaged in it, from criminal or civil liability for acts done in the prosecution of the war. If, therefore, the parties to civil war are entitled to the same belligerent rights that the parties to foreign war are, what do they want with an amnesty? Why are they not protected just as the soldiers in a foreign war are? The only solution to the difficulty is the one given by Judge Cadwalader: That the belligerent rights acquired by rebels in a civil war, are not absolute legal rights to be protected by the courts, but rights which rest upon the discretion of the political department of the government.

The case of the *United States* vs. *Smith,* above referred to, shows how far the courts can notice the rights acquired by the rebels as belligerents, in the late rebellion.

The defendant was indicted for piracy on the high seas, committed, as charged in the indictment and shown by the proofs, on the 6th of July, A. D., 1861. The trial was before Judges Grier and Cadwalader, commencing on the 22d of October, A. D., 1861, and continuing three days. The defence was that the defendant belonged to the crew of the *privateer Jeff. Davis,* which was duly commissioned by the President of the Confederate States to cruise upon the high seas, and capture property of the citizens of the United States. That the supposed piracy consisted in the capture of a merchant vessel belonging to citizens of the United States, as lawful prize of war.

The defence was conducted by *Mr. Wharton*, author of American Criminal Law, and *Mr. Harrison*, who exhibited great zeal and ability in its management.

At the close of the argument, the defendant's counsel requested the court to give the following propositions in charge to the jury, as the law of the case:

"*First.* If the Confederate States of America is a government either *de facto* or *de jure*, it had a right to issue letters of marque and reprisal, and if issued before the commission of the alleged offence, the defendant, acting under the authority of such letters, would be a privateer and not a pirate, and as such, is entitled to be acquitted.

"*Second.* That if at the time of the alleged offence the Southern Confederacy, by actual occupation as well as acts of government, had so far acquired the mastery and control of the particular territory within its limits as to enable it to exercise authority over, and to demand and exact allegiance from its residents, then a resident of such Confederacy owes allegiance to the government under which he lives, or at least by rendering allegiance to such government, whether on sea or land, he did not thereby become a traitor to the Government of the United States.

"*Third.* That if at the time of the alleged offence and the issuing of the letters of marque and reprisal upon which the defendant acted, the courts of the United States were so suspended or closed in the Southern Confederacy as to be no longer able to administer justice and enforce the law in such Confederacy, the defendant thereby became so far absolved from his allegiance to the United States as to enable him to enter the service of the Southern Confederacy, either on land or sea, without becoming a traitor to the government of the United States.

"*Fourth.* If at the time of the alleged offence and his entering in the service of the Southern Confederacy, the defendant was so situated as to be unable to obtain either civil or military protection from the United States, whilst at the same time he was compelled to render either military

or naval service to the Southern Confederacy, or to leave the country; and in this latter event to have his property sequestrated or confiscated by the laws of the Southern Confederacy, such a state of things, if they existed, would amount in law to such duress as entitles the defendant here to an acquittal." Pamphlet copy of trial, page 55.

It will be seen that in this prosecution for a capital crime, defendant's counsel did not claim an absolute justification as an act of war, under a competent belligerent power. They only claimed to negative the felonious intent, by a sort of moral duress.    And there certainly is great plausibility in saying that property taken under orders and for public use, is not taken *animo furandi*, or with a felonious intent.

But the court cut up the whole defence by the roots, and refused all the charges asked for by the defendants, but charged as follows: Grier, Judge—"But it is contended that though property may be taken by violence on the high seas, yet if done by authority of a State in prosecution of a war against another State, the persons acting under such authority, are not guilty of piracy and cannot be punished as such.    This is no doubt true, for piracy has been defined as 'depredation on or near the sea, without authority from any Prince or State.'

"Those having such authority are treated as enemies, or as having the privileges of enemies in open war.

"Thus, Turks and Algerines, though acting as free-booters on the ocean, could not, according to *Sir Leoline Jenkins*, be treated as pirates, because they acted under a commission from States with whom the government had treaties, and had acknowledged to be States in the great family of nations.

"But it does not follow that every band of conspirators who may combine together for the purpose of rebellion or revolution or overturning the government or nation of which they were citizens or subjects, becomes *ipso facto* a separate and independent member of the great family of nations.    A successful rebellion may be termed a revolution, but until it has become such it has no claim to be recog-

nized as a member of the family, or exercise the rights or enjoy the privileges consequent on sovereignty." * * "Every government is bound by the law of self-preservation, to suppress insurrections, and the fact that the number and power of the insurgents may be so great as to carry on a civil war against their legitimate sovereign, will not entitle them to be considered a State. The fact that a civil war exists for the purpose of suppressing a rebellion, is conclusive evidence that the government of the United States refuses to acknowledge their rights to be considered as such.

"Consequently, this court sitting here to execute the laws of the United States, can view those in rebellion against them in no other light than traitors to their country, and those who assume by their authority a right to plunder the property of our citizens on the high seas, as pirates and robbers." Page 96.

In the special reply of Judge Cadwalader to the request to charge that if there was a government *de facto* which he had no power to resist, he could not be convicted, he says: "The law might be as counsel have stated it, if two additional statements could be made. First, if the government of the United States had been superseded by a local government which, though it had originated in a hostile revolution, had for a definite subsequent period, been established or maintained in peace; or secondly, if the defendant, though such a government had not been thus peaceably established and maintained, had been impressed into the hostile service of the revolutionary government and compulsorily detained in the service. As to the first of these two points, the difficulty in the way of the defence is, that the government of the United States has not been subverted, and that its authority in the hostile districts if suspended, or at present superseded, is not superseded by that of a government which has at any time been peaceably established, much less by one which has been maintained in peace.

"The government of the States now confederated for purposes hostile to the Constitutional Union, was not organ-

ized without a contemporaneous outbreak of civil war. This war has been continued without interruption. The contest has been on their part, a war against an established government to which they owe allegiance. So long as this government exists, and the contest is maintained, the peaceable establishment of the revolutionary government cannot be asserted."

The same question was made in the case of *The United States* vs. *The Officers of the Rebel Privateer Savannah,* in the circuit court of the southern district of New York, before Judges Nelson and Betts, in October, A. D., 1861, and was decided in the same way.

If the case at bar were an indictment for robbery, in feloniously and forcibly taking the property described in the declaration, the case of *The United States* vs. *Smith* would be precisely in point, and if it is recognized as authority could not fail to be conclusive of it. And surely the principles decided are equally——indeed more strongly——applicable in a civil suit, than in a criminal prosecution. A felonious intent is necessary to constitute crime. But it is not at all necessary to maintain an action of trespass. If an officer takes property on void process he is liable in trespass, but nobody ever supposed he could be indicted for larceny. Every robbery or larceny is necessarily a trespass. The same taking that constitutes robbery or larceny is of necessity a trespass, because it is an unlawful taking. But every trespass is not necessarily a larceny or robbery, because there may be no felonious intent. If, therefore, a party is liable to an indictment for larceny or robbery in taking goods under the authority of the rebel government, it follows *ex necessitate*, that he is also liable in trespass.

It is sometimes claimed that although parties may be indicted for treason, for acts of hostility committed during the war, yet they were protected by their belligerent character, from prosecution for other offences, such as larceny, robbery or arson. This case, however, explodes that distinction. Piracy is simply robbery on the high seas. It cannot possibly be distinguished in principle from robbery on land.

In the debates in the British House of Lords, piracy was placed on the same footing with robbery on land, when justified under the commission of rebels claiming belligerent rights.    Wheaton's International Law, 251, note.

We take it for granted that we have established the proposition, that it is for the political department of the government, for the President or Congress, or both, to determine how far an insurrection or rebellion is to be regarded as a belligerent power, entitled to belligerent rights.    It is hardly necessary for us to say that the government has from the commencement to the end of the rebellion, been treating it as an insurrection exercising sovereign rights over the persons and property of those engaged in it.    Laws have been passed to punish them as rebels and conspirators, to confiscate their property, and to emancipate their slaves. Proceedings for confiscation have been prosecuted in the courts to final judgment and execution.

Our foreign intercourse has been one continued and incessant protest, against any recognition of the rebels as a belligerent power by foreign nations.    *Mr. Seward's* letter of August 10th, 1865, to *Mr. Adams,* to which reference has already been made, is an illustration of the tone of the correspondence of the State Department, of which the published volumes of the Diplomatic Correspondence are full.

The attitude of the United States government on the subject is plainly set forth in the following official letters:

[*Mr. Seward to Mr. Adams.*]

"DEPARTMENT OF STATE, }
" *Washington, D. C., March* 13, 1865. }

" *Charles Francis Adams, Esq.:*

"SIR—An impression is understood to prevail in Europe, especially among the holders of the Insurgent Loan, for which cotton was pledged as security, that in the event of the restoration of peace in this country this government will assume the public debt of the insurgents, or certainly the particular one referred to.    It is believed, however, that no impression could be more erroneous.    There is no like-

lihood that any part of that debt will be assumed or recognized by the United States government. It is proper and advisable, therefore, that by any proper means at your command you should authoritatively undeceive the public in England on this point.

"I am, sir, your obedient servant,

"Wm. H. Seward.

[*Mr. Seward to Mr. Adams.*]

"Department of State, }
"*Washington, August* 10, 1865. }

"*Charles Francis Adams, Esq., &c., &c.:*

"Sir—I have the honor to acknowledge the receipt of your dispatch. The United States do not admit that the combination of disloyal citizens which has raised the standard of insurrection is now or has at any previous time been a government *de facto*, or in any sense a political power, capable of taking, holding, giving, asserting or maintaining corporate rights in any forum, whether municipal or international. It is true that a different view of the character of the insurgents has seemed to find favor with some portions of the British nation, and even with the British Government. It must be remembered, however, as equally true, that so often as that antagonistical opinion has been advanced by Her Britannic Majesty's Government in its intercourse with the United States, it has been firmly, though, as we trust, always courteously denied. * * *

"I am, sir, your obedient servant,      Wm. H. Seward."

There is still another objection to the claim of belligerent rights under the rebel government. All writers on international law, discuss the causes of war, and discriminate between just and unjust wars. But so far as international wars are concerned, all agree that no nation can hold that the war is unjust on the part of its enemy, and refuse to recognize the usages of civilized warfare on that ground. And inasmuch as publicists also hold that the rules and usages of nations in international wars, are applicable to civil wars, it is assumed that a nation engaged in the sup-

pression of a rebellion, which has assumed the character of a civil war, must recognize the war as just on the part of the insurgents. But this is not the law. This rule as to the recognition of the justice of a war on the part of an enemy, only applies to international wars.

The rule is laid down by Grotius as follows: "By the consent of nations a rule has been introduced, that all wars conducted on both sides by the authority of the sovereign, are to be held just wars." 2 Grotius, p. 196, ch. 17, sec. 19.

And in the application of this principle, he holds that "things taken in an international war may not be demanded back; but what is taken by pirates and robbers may." 2 Grotius, ch. 17, sec. 19, p. 196.

"In order that a war may be formal according to the law of nations, two things are required: first, that it be carried on on both sides by the authority of those who have the political sovereignty; next, that certain formalities be observed of which we shall speak in their place." 1 Grotius, p. 104, ch. 3, sec. 4.

He holds that all rebels or insurgents in a civil war are pirates and robbers, and that captures made by them do not change the title to the property captured, but that it may be reclaimed by the owner.

In discussing the responsibilities of parties to an unjust war, Grotius says: "Restitution is due from the authors of the war for all the evils they have inflicted, or for anything unusual, which they have not prevented when they could. So the Generals are reponsible for what is done by their order, and the soldiers severally and jointly who have joined any act, as the burning of a city and separable acts, each for what he did or aided in doing." 3 Grotius, chap. 10, sec. 4 and 5, p. 192.

"Mere misfortunes neither deserve punishment nor oblige to recompense of loss; unjust actions do both. The intermediate cause, fault, is liable to restitution, but often does not merit punishment, especially capital punishment. 3 Grotius, ch. 11, sec. 4; p. 207.

This seems to us to be the necessary and legitimate result of the doctrine, that it is only in International wars that the cause of the enemy is to be considered just, so far as the recognition of belligerent rights is concerned. As we have already seen, sovereign rights are paramount to belligerent rights, and while a nation claims and exercises the right to punish insurgents or rebels as traitors and pirates, it cannot be required to recognize the war on their part as just, and grant them the rights of belligerents in a just war. And the courts of every country must of necessity hold a rebellion against the sovereign, whose laws it is administering, to be unjust.

The fourth special plea sets up the President's amnesty proclamation of May 29th, 1865. We suppose this plea will hardly be insisted on as a defence to the action.

Whatever might be said about the effect of an amnesty or pardon by the President, on an indictment for an act of hostility in the court of the State, it can hardly be claimed that it can affect the civil rights and liabilities of the citizens to one another. The amnesty proclamation does not, in terms, or by necessary implication, have any such operation or effect. It never was intended that it should have. The President has no power to do any such thing. If one citizen has in any way incurred a legal liability to another, whether in contract or in tort, the President has no power to release it.

In the case of *Hood* vs. *Maxwell*, in the court of appeals of this State, at the January Term, A. D., 1866, it was decided that a defendant in trespass could not justify, or protect himself under the orders of Gov. Letcher, after the passage of the ordinance of secession.

It was held by the court in that case, that the ordinance of secession was unconstitutional and void, that the restored government organized at the June Convention in *Wheeling*, in 1861, was the legal and constitutional government of *Virginia*, and that the orders of *Gov. Letcher*, after the passage of the ordinance of secession, could afford no protection to any party charged with trespass.

Although the court does not discuss the question of belligerent rights, and the protection claimed under the rebel government as a belligerent power, its decision in fact covers the whole ground. Because, if *Gov. Letcher's* orders, either as Governor *de facto* or *de jure*, as the representative of a belligerent power, could afford protection to parties acting under them, the defence in that case would have been complete. But the very point decided in the case was, that the orders of *Gov. Letcher* afforded no protection to the defendant. The question, therefore, in this State, may be regarded as *res adjudicata.*

*Charles J. Faulkner*, in closing the argument in these cases on behalf of the appellant, contended:

That while the special pleas were not drawn with much technical skill, they contained every averment essential to the defence relied upon. They set forth, that the defendant in the court below, was a citizen and resident of the Confederate States of America, and a conscripted soldier in its army;—that at the time of the seizure complained of, a *civil war* existed between the people and government of the United States and the people and government of said Confederate States; that the said seizures were hostile and belligerent acts, made pending said war, and under the orders of the government of the Confederate States; that the property so seized was required for the use of the army of the Confederate States, and could not otherwise, than by military impressment, be procured in time to supply its wants; that the plaintiff was a citizen of the hostile government, and the property seized was taken in hostile territory, and upon this state of facts the defendant claims, that according to the well established principles *of the law of Nations*, the seizures now complained of were the acts of the *Government* under whose orders he acted, and that he is in no wise *personally* liable for the losses sustained by the plaintiff.

To repel this defence, the counsel of the appellees announces as his first proposition, that "International law constitutes no part of the jurisprudence of West Virginia,

and can offer no defence for any act done under its authority, in the courts of this State."

This is a bold and extraordinary proposition. The law of nations is by the common consent of every civilized and Christian nation, a part of its municipal Code. Lord Coke in his 1st Institute, ch. 2, B. 11, enumerates as one of the laws within the realm of England, the *Jus Belli*, the law of war—a term which at that day was used as expressive of the "law of nations." *In republica maxime conservanda sunt jura Belli.* The court of common pleas of England, in the case of *De Weetz* vs. *Hendricks*, 9th English Common Law Reports, 2 Bingh., 314, authoritatively announces this doctrine. So the supreme court of Pennsylvania, in *Respublica* vs. *De-Long Champ*, 1 Dallas, p. 121; and the supreme court of the United States, *Rose* vs. *Himeley*, 4 Cranch, 277. Hamilton's Works, 8 vol., p. 439. Mr. Webster, then Secretary of State, and speaking in the name of this government to Mr. Fox, the British minister, in the celebrated *McLeod* case, says: "The indictment against *McLeod* is pending in a *State* court, but his rights are no less safe, than if he were holden to answer in one of the courts of the Federal government. He demands immunity from personal responsibility by virtue of the *law of nations*, and that law in civilized States is to be respected in *all* courts. None is either so high or so low as to escape from its authority in cases to which its rules and principles apply." 6 vol. Webster's Works, page 254. So thoroughly is this doctrine recognized in England, that a private contract, otherwise valid, was declared void when made in violation of the law of nations, and all right to maintain an action upon it denied. 9th Eng. C. L. R., p. 417. It may therefore be assumed, that when ever a case pending in any municipal court comes fairly within the scope and operation of International law, it supersedes the municipal law, and determines the rights and responsibilities of the parties to the action.

In what cases do the rules and principles of the Law of Nations apply, so as to be paramount in their operation to the municipal code?

When two nations are at war, their rights and responsibilities *inter se*, and with all neutral governments are regulated and prescribed by the law of nations. The governments of every civilized people recognize its authority and yield obedience to its rules. The parties conducting this war are styled *belligerents*. Their rights and responsibilities as such, are accurately defined by that code.

There are certain fundamental doctrines which result from this state of *belligerency* which are of universal recognition.

1st. All belligerents are regarded as equal in the eye of the world and of International law, and are entitled to equality of rights and privileges. Wheaton, part 4, ch. 1, sec. 6; Vattel, book 3, chapter 12; Judge Nelson, 2 Black, page 686.

2d. No individual responsibility exists for acts done in the regular prosecution of war, but all personal responsibility is merged in the political society or government of which they are members. Halleck's Law of Nations, pages 306, 348, 463; Charles Lee, Atto. Gen'l of the U. S., 1797, 1 vol. of Opinions, p. 81. Mr. Webster, when Secretary of State, writing to Mr. Crittenden, Attorney General, says: "That an individual, forming part of a public force and acting under the authority of his government, is not to be held answerable as a *private trespasser* or malefactor, is a principle of public law sanctioned by the usages of all civilized nations, and which the government of the United States has no inclination to dispute." 6 vol. of Webster's Works, p. 264.

3d. No distinction is recognized between just and unjust wars. Wheaton's Law of Nations, pages 514, 515.

4th. All the principles which apply to public and national wars apply equally to *civil wars*. Lawrence's Wheaton, p. 521; Requelme, vol. 1, p. 172; Vattel, book 3, ch. 18; Bello, ch. 10, p. 267; Supreme Court of the United States, *Prize cases*, 2 Black. R., p. 635.

The next enquiry is: Did the States that dissolved their temporary connection with the Federal Union, and revolted against its authority, (styling themselves the Confederate

States of America,) acquire in the progress of the war, such a *status* as entitles those who acted under its orders and authority, to that immunity from personal liability, which the laws of nations accord to belligerents in public and national wars?

As the Confederate States was not an independent nation but a part of the United States of America, in other words, as this was an effort upon the part of a portion of an Empire to throw off the authority of the sovereign power, it is conceded, that it will be necessary to show, that the *political* department of the government of the United States recognized the States in rebellion as a belligerent power before that character will be accorded to it by the *courts*. *Luther* vs. *Borden*, 7 Howard, p. 40; 13 Peters, 420; 7 Wheaton, 305.

*Mr. Faulkner* then proceeded to show that both the executive and legislative departments of the Federal government had to the fullest extent, recognized the insurrectionary States as a belligerent power, and he thought, there were forcible and satisfactory reasons which as statesmen left those in control of public affairs, no alternative but to adopt that course.

1st. *The Executive Department.*—The President on the 15th of April, 1861, proclaimed a *blockade* of the ports within certain States, in pursuance *"of the law of nations"* in such cases provided, and gave warning that vessels breaking or attempting to break that blockade, should be captured and condemned as lawful prize. By a subsequent proclamation of April 27th, 1861, this blockade was extended to other States. This was not what publicists term a *simple* blockade, but a *public* or governmental blockade, of which due notice was officially communicated to all the commercial nations of the world. What is a blockade? It is an exercise of the *summum jus belli*—of one of the highest rights of war. It can have no existence except in a state of war. The government which proclaims a blockade, proclaims to the world, that it is at war—war in the sense of International law, *with the people*, from whose ports it seeks to exclude the commerce of the world. Upon no other relation to such a

people, would neutral nations submit to the abrogation of those rights of trade and intercouse guaranteed to them by existing treaties, and in no other relation could the United States have entitled itself to the benefit of those rigid rules of commercial exclusion, which the common consent of the world and law of nations accord alone to a belligerent in the prosecution of hostilitics against its enemy.

Much complaint has been made in this country at the course of England, France and Spain in recognizing the belligerent *status* of the Confederate States. But England did not *precede*, but followed the United States in that recognition. The present Prime Minister of England, *Earl Derby*, in a recent speech in the House of Lords, has done no more than justice to the policy of his great rival *Lord John Russell* on this subject. In referring to the policy pursued by *Earl Russell* in the spring of 1861, he says: "The question of recognizing belligerent rights is inherent in every independent power, but such recognition should not precede, but follow a declaration of blockade by the United States; to blockade is essentially the exercise of a belligerent right, and when a blockade was declared by the United States, there were two courses open to Her Majesty's government: to refuse to recognize the validity of the blockade on the ground that there were no belligerents, or on the other hand, to recognize the belligerent rights of the two parties. And I think that between the two alternatives, *Earl Russell* selected that which was most friendly to the United States, when he recognized the blockade, although by taking this course he found himself under the necessity of recognizing correlative obligations."—*London Times.*

Justice *Grier* in delivering the opinion of the Supreme Court of the United States in the *Prize case*, 2 Black., p. —, says: "The proclamation of blockade is itself official and conclusive evidence to the court that a state of war existed, which demanded and authorized a recourse to such a measure."

He would not proceed into any detailed examination of the various proclamations and acts of President *Lincoln*

recognizing the Confederate States as belligerent, but would content himself with a brief reference to them in a work entitled "The War Power of Congress," written and published by *William Whiting* in 1863, then solicitor to the War department, a distinguished jurist and leading member of the republican party. This law-officer of the War Department, after referring in detail to those acts and proclamations, concludes as follows: "The Executive Department has thus definitely settled the question, that all inhabitants of the designated States are *public enemies.* First, by proclamation depriving them of slaves, of ships, of property used in commerce; by a blockade and a declaration of non-intercourse; by claiming against them, the *rights of war;* and by asserting that the existing hostilities are 'war.' Second, by extending to the insurgents the usual rights and privileges of a belligerent public enemy; as by release of captured pirates (under the order of the President issued from the State Department), as prisoners of war; by exchange, by cartel, of prisoners of war captured on land; by claiming the right of retaliation, and by various other acts, which are legitimate in the conduct of war, but irreconcilable with the assumptions that the United States are not engaged in war, but only in enforcing the laws against certain criminals who have violated certain statutes by engaging in insurrection or rebellion."

"If these acts and these proclamations do not show that the Executive Department has declared and determined the *status* of the inhabitants in insurrection to be that of public enemies, it would be difficult to conceive of any course of executive proceedings that would have that effect." War Powers of Congress, pp. 298, 299.

In a note referring to the President's Message and Proclamation of Amnesty of the 8th of December, 1863, issued subsequent to the first edition of his work, he says: "The effect of these upon the persons, property and political rights of the inhabitants of the rebellious States far transcends in importance that of either of his previous executive acts."

Again, page 245, "We find in this well settled doctrine

of belligerent law, the solution of all questions in relation to State Rights. After the inhabitants of a district have become public enemies, they have no right, either State or National, as against the United States. They are belligerents only, and they have left to them only *belligerent rights.*" War Powers of Congress.

The *Hon. Thadeus Stevens* has furnished us with an interesting historical reminiscence bearing on this subject:— "When the rebellion first commenced," he says, "I was in favor of treating it as a rebellion, and the participators in it as traitors to the government of the United States, liable to be punished for their treason. It was so understood in Congress, and I suppose it was so understood by the President and his Cabinet. After the adjournment of the first session of Congress during *Mr. Lincoln's* term, shortly after my return to my home, I saw, to my surprise, a proclamation declaring a blockade of all the rebel ports. I went to Washington to see and talk with the President on the subject. I laid my views before him, and told him that the blockade was a stultification of the former position of the government in relation to the rebel States; that the ports, instead of being blockaded, should have been closed, and a sufficient number of armed revenue vessels sent out on the seas to prevent smuggling. I pointed out to him the fact, that by the act of blockade we recognized the rebel States as an independent belligerent, and should thenceforth be compelled to conduct the war, not as if we were suppressing a revolt in our own States, but in accordance with the law of nations. *Mr. Lincoln* said, 'it is done now, and can't be helped.' In this *Mr. Lincoln* was right. The blunder had been committed, and the rebel States were thenceforth an independent belligerent. Not an independent nation, of course, but an independent belligerent, to be dealt with in accordance with the law of nations."

2d. *Legislative Department.*—The action of Congress on this subject was in harmony with that of the President. In support of the position referred to, see the act of July 13, 1861, ch. 3; August 2, 1861; May 20, 1862, ch. 81; July 17,

1862, ch. 195; March 12, 1863, ch. 120. "From these statutes it is seen," says the same able law officer of the War Department, "that the legislative department has recognized certain districts of country not only as in a state of insurrection and rebellion, but as 'carrying on a war' against the United States. Commercial intercourse has been interdicted between the insurrectionary and the loyal States, and property found *in transitu* is made liable to seizure and confiscation for the use of the United States, and property of persons engaged in the rebellion is to be siezed and confiscated as enemies' property. Thus belligerent rights derived from the acknowledged existence of civil territorial war, have been plainly asserted and exercised by Congress, and the insurrectionists have been treated as a public enemy in every form and manner known to legislation and in language far more stringent than that used by Great Britain when by the non-intercourse act, our revolutionary war was changed by act of parliament into a public territorial war."

*Wm. B. Lawrence,* the learned annotator upon Wheaton's Law of Nations, in referring to the act of Congress of July 13, 1861, says: "It will be noticed that in the law no discrimination is made between the loyal inhabitants and the rebels; the same rule being applied as in the case of a *foreign war,* when all the inhabitants of one of the hostile States are regarded as enemies of the other. Such a course is especially repugnant to natural justice, if the inhabitants, while exposed to the disabilities of *alien enemies,* are not permitted to plead the orders of a *de facto* government for acts done under its authority." Lawrence's Wheaton, p. 555.

Following the action thus adopted by the executive and legislative departments of the government, the Supreme Court of the United States, in the *Prize cases,* 2 Black., p. 635, 699, recognized the existence of a civil war between the people and the government of the United States, and the people and government of the insurrectionary States, and adjudged property of residents of the Confederate States to be lawful prize of war upon principles of International law alone applicable to belligerents. 2 Wallace, *Mrs. Alexan-*

*der's cotton*, 419; *Circassian*, 2 Wallace, 147.   Thus, all the three departments of the government—executive, legislative and judicial—have concurred in recognizing the Confederate States as a belligerent power.

There were reasons of policy and wise statesmanship which prompted the United States to treat the confederates as belligerents and not as rebels :

1st.  The magnitude of the contest,—the sectional character of the struggle,—and the utter impracticability of dealing with such an insurrectionary force otherwise than in accordance with the principles of International law.

2d.  The superior efficacy of a blockade as compared with an order closing the ports. 2 Wildman on International Law, ch. 4; *Rose* vs. *Himely*, 4 Cranch, 267.   It was well said in that case by the learned counsel for the libellants—"There would have been a gross inconsistency in France treating the revolters as rebels, and yet claiming that other nations should consider them as enemies.   Before France can claim the rights of war from neutrals, in regard to the insurgents of St. Domingo, she must admit them to be *enemies* and not *rebels*. p. 247.   England and France informed the Secretary of State, that they would consider any decree *closing the ports* of the United States, not in possession of the government, as null and void, and that "they would not submit to measures taken on the high seas in pursuance of such decree." Parliamentary Papers, 1862; North America, No. 1, p. 72; Lawrence's Wheaton, p. 555; note.

3d.  It was the only policy which could lead to that unity and harmony of action and sentiment in the North which resulted in the suppression of the insurrection.

4th.  It released the United States from all responsibility for the acts of the confederates to foreign nations.   As *Mr. Adams*, Minister in London, in adverting, June 14, 1861, to the concession of belligerent rights to the confederates, remarks,—"At any rate, there was one compensation: the act had released the government of the United States from the responsibility for any misdeeds of the rebels towards Great Britain.   If any of their people should capture or

maltreat a British vessel on the ocean, the reclamation must be made only on those who had authorized the wrong." Foreign correspondence of 1861, p. 89; see also *Mr. Canning's* letter to *Mr. Del Rios,* March 25, 1825.

The sovereignty of the United States was suspended in the county of *Berkeley,* during the period of the alleged trespasses. The authority of the Confederate States, as a *de facto* government, was supreme within those limits. From the nature of the case, no other laws could be obligatory upon them, for where there is no protection, allegiance or sovereignty, there can be no claim to obedience. The subsequent evacuation of the enemy, and resumption of authority by the United States, did not, and could not, change the character of previous transactions. *United States* vs. *Rice,* 4 Wheaton, p. 253, 255.

He conceded that it was competent to the United States in suppressing the insurrection, to have resorted to the exercise, either of its sovereign or of its belligerent rights, but he maintained, that when the Federal government had elected to treat the confederates as belligerents, and to place itself and its enemy under the rights and responsibilities of International law, it was not then legally competent to impose upon the vanquished party the disabilities both of conquered enemies and of unsuccessful traitors. From the moment they were recognized as public enemies, they ceased to be traitors. He thought the opinion of the Chief Justice *Marshall* in the case of *Rose* vs. *Himely,* 4 Cranch, relied upon by the appellee's counsel, had not been correctly presented. He referred to *Mr. Webster's* address on the 17th of June, 1825, where speaking of the battle of Bunker's Hill, he spoke of its effects beyond its results as a military engagement. "It created at once a state of open, public war. There could no longer be a question of proceeding against *individuals,* as guilty of *treason* or *rebellion.* That fearful crisis was past." 1 vol., p. 69.

He next proceeded to examine the authorities cited by the counsel for the appellees. The first is 1 Bay's S. C. Rep. Unable to find one case in the six centuries of English adjudi-

cation to sustain his views, he falls back upon the decision of an inferior court of the State of South Carolina! Whatever may be the decision of the court as to the point now under discussion, all will concede that the South Carolina case is a stain upon its judicial history—a case in direct violation of the law of nations—and a *nullification* of the supreme law of the land,—the treaty of 1783. *John Jay*, then Secretary of State, and afterwards chief justice of the United States, in his report to Congress referring to a class of State legislation and State decisions encouraging actions similar to these involved in the present record, and which seriously embarrassed the policy of the government, says: "Your secretary has reason to believe that this is the first and only act of the kind that was ever passed by any legislature or sovereign. Neither the laws nor the practice of nations (as far as your secretary has knowledge) afford any countenance, or color to an opinion, that after a war has been terminated by a treaty of peace, either of the late belligerent powers or their respective citizens, have a right to commence and prosecute actions at law against the soldiers, subjects or adherents of the other, for damages by them done during the war, and in the course of invasion and hostilities by military order. . Such an opinion appears to your secretary, to be so destitute of even resemblance to reason, that a particular exposition of its demerit would be an unnecessary and therefore improper application of time and attention. In a word, they are in his opinion, a direct violation of the treaty of peace, as well as of the acknowledged law of nations." 2 vol. Diplo. Cor., p. 86. See also circular letter from Mr. Jay to the governors and legislatures of the several States, —prepared in pursuance of an order of Congress—remonstrating against this course of State legislation and judicial decisions. p. 105 to 113. Also letter from *John Adams*, p. 40.

The decision of Chancellor *Pertle*, of the Louisville district, Kentucky, in September, 1864, much relied upon by the appellee's counsel,—being based upon the authority of the case in 1 Bay's S. C. Reports,—may be regarded as disposed of with that case.

He examined the opinion of Judge *Nelson*, rendered in the trial of the officers and crew of the schooner *Savannah*, and the opinions of Judges *Grier* and *Cadwalader*, in the case of *Capt. Smith and others*, and denied that these opinions sustained the conclusions drawn from them.

In support of the doctrines maintained by him, *Mr. Faulkner* referred to the case of *Thomas Stoughton*, consul of His Catholic Majesty, &c., in behalf of the owners of the *Brig Teneriff and her cargo* vs. *Thomas Taylor*, and quoted largely from the opinion of Judge *Van Ness*; 15th vol. Niles' Reg., pp. 167 to 175; *Bland* vs. *Adams Express Company*, 1 Duvall's Ky. Reports, p. 232; *Commonwealth* vs. *Holland*, *Ib.*, p. 182; and the able and luminous opinion of Judge *Newman*, delivered in the case of *James R. Hughes* vs. *John B. Letsey*, and reported in the January number of the Law Register for 1866; opinion of Judge *Trigg*, of the Tennessee Federal district, in the case of *ex parte McNab*.

The counsel for the appellees frankly admit that they can find no English reported cases, sustaining an action of trespass under circumstances analogous to these embraced in this record. It is believed that none can be found in that country among their decisions which extend back six centuries. It has been well settled in England that a municipal court has no jurisdiction of cases of *hostile* seizure. *Le Caux* vs. *Eden*, 2 Douglass, 594; 3 Phili. Inter. Law, pp. 193–4; *Elphestine* vs. *Bedreeckhand*, 1 Knapp, 360; Halleck's Law of War, p. 466.

He referred to the Report of the Joint Committee on Reconstruction, adopted by both Houses of Congress, (p. 10 and 11), to show that the views which he maintained of the character of the late contest, and of the relations between the Southern States and the Government, were now proclaimed by the political power of the nation, and made the basis of their legislation and policy.

BROWN, President.

These are three several actions of trespass *de bonis asportatis*, in which Enoch G. Hedges, the defendant in the court

below, who is the plaintiff in error here, pleaded the general issue, and filed four special pleas of justification in bar in each case—except one.

The special pleas in each case were the same respectively, and were all demurred to, and the demurrers sustained.

And the only question is whether the three special pleas constituted a bar to the action.

Several objections have been taken to the form of the pleas, even upon the hypothesis that a rebel soldier may plead his rebellion in justification.

Now, that several, though perhaps not all of these objections, are well taken, I am sufficiently satisfied—but have not given them the consideration I should have done had the cases turned upon them—nor do I deem them of sufficient importance to justify a longer delay of the decision of the main and great question involved in these contests, upon which the rights of the parties must ultimately turn, and yet they are too important, as questions of pleading, to be determined hastily.

I think it proper, therefore, to express no opinion upon these objections—that shall conclude an impartial reconsideration when a similar objection may arise, but have directed my attention to the main question which lies at the bottom of all these cases, and in its effects reaches far beyond them.

The plaintiff in error makes six points for the consideration of the Court—which may be reduced in substance to three, viz:

1. That the late rebellion was a civil war.

2. That during the war the same belligerent rights which pertained to the United States, likewise pertained to the Confederate States, so-called.

3. That a soldier of the latter is responsible only to the former, and not to the private party injured by him, and that liability ended with pardon.

The first proposition is not controverted by the opposite side, nor can there be any doubt of its correctness, whether tested by the facts of the case, the various writers on Inter-

national law, or the decisions of the Supreme Court of the United States and several of the State Courts.

The third proposition is not equally admissible.

If the second be true, it is difficult to see how the third can be correct, for it seems to be in direct conflict with it.

By what principle of International law is the soldier of one belligerent power held individually responsible to the other? To his own master he standeth or falleth.

If the soldier of one belligerent sovereign enter the territory of a neutral power and commit a breach of the municipal law of such neutral, or violate the rights of its citizens, he is personally responsible, whether he acted under the authority and orders of his sovereign or not, and whether the act done was done in furtherance of the object of the war; and that, too, even though the citizen had been a *particeps* in the hostilities against the sovereign whose authority was vouched for the offending soldier. *People* vs. *McLeod*, 25 Wendell, 483. And here I feel constrained to say, that notwithstanding the criticisms of this case in Wendell, in the argument at this bar, and notwithstanding the opinion of Mr. Jay and Mr. Webster, I think the correct views of the case are declared and maintained by Mr. Forsythe and Judge Cowan, who delivered the opinion of the Supreme Court of the State of New York in that case.

Upon the principle contended for, of the equality of belligerent rights, the rebel soldier, as such, could owe no responsibility to the United States which the Union soldier did not owe to the Confederate States, so-called, but as a citizen, subject to the sovereign power, which he sought in vain to subvert, the rebel-soldier most unquestionably owed responsibility to the United States, which the Union soldier never owed to the so-called Confederacy. The difference is great.

But as respects the third proposition, it may be remarked further, that the same act may be, and often is, a private injury and a public offence, and the latter no less because of the former.

If one assault another, or commit a trespass upon his pro-

perty, which the statute declares to be a public offence, no one would pretend that the offender's liability to the State for the public offence would destroy the right of the party to redress for the private injury. Neither would a pardon for the public offence defeat, or in anywise affect, the private right to redress in the courts of the sovereign granting the pardon, nor in any other courts.

Admitting, then, as the proposition seems to suppose, the rebel soldier to have offended against the United States, and to be responsible therefor to the government, it is not perceived on what principle that offence and responsibility can be made a ground to defeat the right of the injured citizen to redress, or release the offender from liability for his acts. It is certainly very competent for the government to pardon the public offence, but I know of no way by which it can discharge the obligation or liability of the party to make restitution for the damages he has done to a private citizen, but by paying the damage done by the person pardoned. It is certain the pardon has no such effect.

By the law of nature, as well as by the civil law, the right of personal security and private property exists, and whoever invades those rights inflicts an injury upon the owner which it is the duty of the government, through the forms of law, to redress.

In every well ordered government these rights are sacredly guarded, and a complete remedy furnished by action in the courts for their violation.

From these rights spring duties which are correlative. The law therefore is but the mandate of the Government, commanding what is right and prohibiting what is wrong, addressed to those who are bound to obey it. The parties were both citizens, and as such, both subject to the same law.

This right of property in the citizen has been violated, and the party who did it, to avoid making restitution or compensation, justifies the act upon the ground that he was a citizen and soldier of another government, viz: of the Confederate States, so-called, and acted under its authority.

July Term,              Hedges *vs.* Price, *et al.*              1867.

According to the principles laid down by this court in the case of *Hood* vs. *Maxwell*, 1 West Virginia Reports, 219, there could be no rightful or lawful government of the description pretended, and that all who aided and abetted it were in the wrong, and that wrong-doers cannot screen each other from the consequences of their wrongful acts by setting up their pretended or usurped authority. Nor has the government of the United States, by word or act, ever acknowledged, or recognized the so-called confederacy as a government, or nation—nor in any other way than as a powerful combination of citizens in a state of insurrection and rebellion against their lawful government. And the above views are corroborated by the reasoning and principles of the following cases: *Luther* vs. *Borden*, 7 Howard, 1; *Mitchell* vs. *Harmony*, 13 Howard, 128; *Rose* vs. *Himely*, 4 Cranch, 241; *Filkins* vs. *Hawkins*, decided by the Circuit Court of Arkansas, January number, 1866, American Law Register; 1 J. J. Marshall, 206.

It is claimed by the plaintiff in error that by the law of nations the soldier is not responsible for his acts done *flagrante bello* between two sovereignties which are the belligerents, and which must both be taken to be in the right. And this is not controverted.

But it is further claimed that in a civil war the same rules apply, and inasmuch as the late rebellion swelled to the proportions and assumed the character of civil war, upon a grand scale, that, therefore, the acts of the party in question were right, and whether right or wrong, he is not responsible, because the acts were done by him as a soldier, in a civil war, by order of an officer, under the authority of the so-called confederate government.

Now if it be true that the same rules are to be applied in civil wars and international wars, or rather, if the same rules are to be applied to the established and rightful government—in a civil war resulting from the effort to suppress a rebellion declared to be unjust and wicked, and by the result proved to be so, and the rebels thus suppressed, then

unquestionably would the party here stand justified upon the proposition assumed by the plaintiff in error.

And this brings us to the consideration of the second proposition, which is the question of great interest now perplexing the minds of the people, bar, and bench, more particularly in the border States.

But is it true, that the same rules apply as supposed, in the sense and to the extent claimed?

Vattel and other authors are cited, stating the doctrine in general terms. The former says, b. 3, ch. 18, sec. 294, that "the common laws of war, those maxims of humanity, moderation, and probity, which we have before enumerated and recommended, are in civil wars, to be observed on both sides." And again, "should the sovereign conceive he has a right to hang up his prisoners as rebels, the opposite party will make reprisals; if he does not religiously observe the capitulations and all the conventions made with his enemies, they will no longer rely on his word; should he burn and destroy, they will follow his example; the war will become cruel and horrid; its calamities will increase on the nation."

But here it may be well to bear in mind the remark of Chief Justice Marshall in delivering the opinion of the court in the case of *Rose* vs. *Himely*, 4 Cranch, 241, in which he said: "In support of this argument the doctrines of Vattel have been particularly referred to. But the language of that writer is obviously addressed to sovereigns, not to *courts*."

But, it is equally true that Vattel and other elementary writers on the law of nations, also lay down the doctrine with equal clearness, that when a rebellion is suppressed, the sovereign or established government may punish the insurgents and make examples of the instigators or ringleaders and such others as it may be thought proper to reward with the punishment due to their deserts; in the words of Vattel, "may bring them to legal trial, and on conviction, punish them." This would be strange language to hold of soldiers or prisoners in an International war, and utterly in-

consistent with the doctrines he had laid down with regard to them. He says again, "it will be wise in the Prince to secure his prisoners till, having restored tranquility, he is in a condition of having them tried according to the laws." But who ever tried prisoners of war according to the laws in any but a civil war or insurrection? None. He also says, "As to the other effects which the law of nations attributes to public war, (see chapter 12, of this book), and particularly the acquisition of things taken in war; subjects who take arms against their sovereign without ceasing to acknowledge him, cannot pretend to these effects."

Such is the rule in reference to rebels who take arms against their sovereign without ceasing to acknowledge him; and the *same* rule equally applies to those who, repudiating the sovereign authority, take arms and fail at establishing attempted independence—at least after the suppression of the rebellion.

And the Supreme Court of the United States has said expressly in the *Prize cases*—2 Black, 673—that the rebels, because enemies in a civil war, were not the less traitors.

Nothing, therefore, can be clearer from the authorities than that the same rules do not always apply, nor the same rights and immunities appertain, in both wars.

The law of nations does not subject the parties to the same liabilities, nor does it screen traitors and rebels from the punishment of their crimes because they are also enemies. On the contrary, the law of nations recognizes the distinction between International and civil wars, and applies the rules in the one case to the other so far, and so far only, as reason and necessity require, and the two conditions harmonize, but never so far as to make those who are only enemies, guilty of treason, nor to purge out the treason of those who have also become enemies.

The assumption, therefore, that all the same rules apply in civil as well as International war, is not true, but only partially so, and the question is still open whether the same rule applies in the case at the bar.

If the plaintiff in error had been the citizen or subject of a foreign or independent power, and had done the acts in question by order of his superior, as a soldier, in an International war, no one questions the fact of his immunity from personal liability.

But where has the case been decided that has applied the same rule to the rebel in a civil war?

Yes, one has been cited from Kentucky, and while this court regards the courts of Kentucky as high persuasive authority, but by no means binding, *only* as the decision shall be sustained by principle or authority.

And tried by this rule, I feel constrained to say that a review of the case has failed to satisfy me of its correctness in principle or in accordance with the authorities on which it purports to be based.

On the contrary, the converse is rather established by the counter decisions of some of the courts of the same State, viz: *Lucas* vs. *Bruce*, Ky. chy. ct., 4 Amer. Law Register, (new series), 95; *Norris* vs. *Doniphan*, reported in Am. Law Register, June number, 1864, new series. In the Supreme Court of South Carolina, in the case of *White* vs. *McNeily and others*, 1 Bay, 11; and also in the case of *Administrator of Whitaker* vs. *English*, 1 Bay, 15; by the Circuit Court of the United States for the District of Pennsylvania, in the *Jeff. Davis piracy cases;* and for the District of New York, in the *Savannah piracy cases;* by the District Court of the United States for the District of Massachusetts, in the case of the *Amy Warwick;* by the Supreme Court of Maine in the case of *Dole* vs. *Merchants' Mutual Marine Insurance Co.*, 51 Maine Rep., 465; and by this court in the case of *Hood* vs. *Maxwell;* and by the Supreme Court of the United States in the *Prize cases*, 2 Black, 673.

And Judge Bullitt, delivering the opinion of the court of appeals of Kentucky, in the case of *Norris* vs. *Doniphan*, says: "The law of nations has no obligatory force upon the 'sovereign' in dealing with his subjects. He may disregard and establish a different rule; and if he does so, those within his jurisdiction must observe the rule so established, how-

ever it may conflict with the usage of nations." And again he says: "Civil wars, being in many respects of the same nature as public wars, the right to treat armed rebels, in many respects, as if they were alien enemies, necessarily results from the power to make war upon them. The facts, that prisoners are exchanged, that flags of truce are respected by the opposing forces, that armed rebels may be lawfully slain in battle, that their arms, ammunition, and stores may be lawfully taken and used or destroyed, that articles contraband of war being sent to them, may be lawfully confiscated, that their ports may be lawfully blockaded, and that their property on the high seas may be lawfully seized as prizes of war, these facts prove that civil wars are, in many respects, the same as wars between separate nations; and they prove nothing more."

We have said the same rule applies in both wars—so far, and so far only, as the reason and necessity of the case require.

What then is the reason that the soldier in an International war is not responsible personally? We answer, because the war is not his quarrel but his sovereign's, and he a humble instrument in the hands of that sovereign whom he is in duty bound to obey.

It would be contrary, therefore, to the first principles of justice, to punish him instead of the sovereign.

Again, the sovereign in prosecuting the war, or treating for peace, is supposed to secure indemnity for his injured subjects as well as himself, from the other State. But no such reason can apply in the case of rebels against their lawful government, when they have been reduced by force to obedience. Instead of the law supposing the rebel to be influenced by duty and constrained by rightful authority to take up arms, it supposes him to be guilty of treason in doing so, which the law regards as the highest crime.

And when the rebellion is suppressed, the sovereign and his injured subjects have no chance of redress or indemnity as from a hostile State. In the eye of the law the success of the sovereign establishes beyond controversy, in all his

courts, the criminality of the rebellion, whatever salvo the rebels may choose to lay to their consciences.

And if there was no personal responsibility, then there would be a wrong without a remedy, a government without protection to its people, but rather a screen to its enemies. It would be to give immunity to crime and every species of robbery, encouragement to traitors, and punishment to patriotism. The reason and necessity, therefore, which required immunity in the one case, not only do not require it in the other, but absolutely forbid it. And since such a rule would violate the principle on which all rightful authority in government is maintained, and justice enforced, it would seem to require an express ratification by all the nations of the earth to make it obligatory as a part of the *jus gentium.*

Again, much has been said in the argument about sovereign and belligerent rights. I take it to be a fact not controverted, that every government deserving the name, has the sovereign right to suppress rebellion by all the machinery of its civil power, and when that fails, the belligerent right to do it, by military force: in other words, by war. That the latter is cumulative and not a limitation of the former, and may be both exercised at the same time, and often are.

And further, that the established government in asserting its belligerent rights in suppressing a rebellion, thereby gives to the rebels no rights which they did not have before, further than that government may choose to accord corresponding privileges to those rebels.

Nor does the law of nations confer any rights upon such rebels which the established government refuses to concede, either in express terms or by necessary implication, from its course and dealings in the war.

By appealing to its belligerent powers the established government may obtain rights it did not have before, but does not lose any of its sovereign powers that it had before.

For instance, by war the property of a loyal man in the hostile territory, would be liable to capture, whether the owner resided in the hostile district or in a loyal State, and

so likewise the property of a loyal citizen wherever resident, going to, or coming from the hostile district. 8 Cranch, 110; 2 Wallace; *Mrs. Alexander's case*, 2 Black, 673.

But even this right of capture, the established government may not choose to exercise, and until so done, the right of property of an enemy would not be divested.

But for a state of war, the government could have no such right to seize and appropriate the property of a loyal citizen so situated, any more than the property of any one else so situated.

The law of nations regulates the relations of independent States, and cannot be changed by either; but not so with an established government and its own citizens, (whether in rebellion or not). For every nation may change or modify the law of nations as it chooses, as respects its own citizens or subjects.

The truth is, that no sovereignty in suppressing an insurrection or rebellion, is bound by the laws of nations to yield its sovereign rights farther than humanity and the necessity of the case require, and they mainly relate to the treatment and exchange of prisoners. The government of the United States throughout the late rebellion, never acknowledged, nor recognized by word or deed, the so-called Confederacy, as a political power, or as having right or authority to command the obedience of any one. Neither has the political department of the government, in its legislative or executive branches, ever acknowledged the said Confederacy as a belligerent power. On the contrary, such recognition is expressly denied or purposely and manifestly withheld and avoided.

The proclamation of the President, of April 15th, 1861, which was the first on the subject, expressly declares that the laws are opposed and their execution obstructed—in the States of South Carolina, &c., by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by law, and called forth the militia of the several States, to the number of 75,000, to suppress said combinations and cause

the laws to be executed, and to repossess the forts, places and property which had been seized from the Union, &c.

The proclamation of April 19th, 1861, establishing a blockade of the ports in the States where this insurrection existed, recited that an insurrection against the Government had broken out in the States of South Carolina, &c., and that the laws for the collection of revenue could not be executed, and that the combination of persons engaged in such insurrection had threatened to grant letters of marque, &c., and that an executive proclamation had been issued, requiring the persons engaged in these disorderly proceedings to desist therefrom, calling out a military force for the purpose of repressing the same, and convening Congress in extra session to deliberate thereon.

And finally the executive proclamation issued on the 16th day of August, 1861, in pursuance of the act of Congress, approved July 13th, 1861, after reciting the facts set forth in the preceding proclamations, and the refusal of the insurgents to disperse, as commanded, and also, that the insurgents in all of said States claimed to act under the authority thereof, and that the claim was not disclaimed by the persons exercising the functions of Government in such States, &c., nor had such insurrections been suppressed by such States, &c. Declared that the inhabitants of said States were in a state of insurrection against the United States, and that all commercial intercourse with the same was unlawful, except, &c., and the property to be forfeited, except, &c.

So also the act of Congress approved August 6th, 1861, levying a direct tax of twenty millions of dollars and apportioning it among the several States of the Union, not among the loyal States only—but upon the disloyal also, in express terms.

So also, the act to confiscate property, especially slaves used in aid of the rebellion.

These acts and proclamations, with numerous others, equally positive and plain, assert the jurisdiction of the Government over the insurrectionists in the States mention-

ed, which precludes the idea of a recognition of any other or foreign government having jurisdiction there.

So Mr. Seward, the Secretary of State, in his official dispatches to our foreign ministers, expressly repudiates the pretension that the Confederacy, so-called, was to be regarded as a belligerent power. See Diplomatic Correspondence.

Upon any other hypothesis than the exercise of sovereign rights over the insurrectionary district, it would be difficult to reconcile the legislation referred to, with the doctrines declared by Chief Justice Marshall in the case of *Rose* vs. *Himely*, where he said, "It is conceded that the legislation of every country is territorial; that beyond its own territory, it can only affect its own subjects or citizens. It is not easy to conceive a power to execute a municipal law, or to enforce obedience to that law without the circle in which that law operates. A power to seize for the infraction of a law is derived from the sovereign, and must be exercised, it would seem, within those limits which circumscribe the sovereign power."

Thus, then, the government of the United States, in its political department, in both branches thereof, viz: legislative and executive, has declared the late war an insurrection, which was suppressed by military force.

Several of the great nations of the earth, acknowledged the said Confederacy as a belligerent power, and in part, though not in whole, treated it accordingly. They chose to extend to it many rights and privileges of an independent power which our government never extended or admitted, and yet, those very nations stopped short of admitting the rebel claims to independence and nationality, and refused to receive or send ambassadors to or from them. They did not in this refusal, extend all the same rules to these belligerents alike, else, why send and receive ambassadors on one side and not on the other?

But what boots it, if those nations did acknowledge the so-called Confederacy to be a belligerent power, and in part so treat it, did that in any wise change the relation of

the insurgents to the lawful government—or give their unlawful combination, by whatever name called—any rightful or political existence? Not in the least.

As well hold the United States bound to get the consent of foreign nations to enforce its laws against the insurgents.

Where a sovereign has to resort to war to suppress insurrection against his authority among a portion of his subjects, what motive can possibly be assigned to induce him to limit his sovereign rights, to deal with his insurgents, otherwise than as his laws require? Humanity and necessity? In obedience to these, he treats and exchanges as prisoners of war his captured subjects, not because he recognizes any right in the insurgents to demand it of him, but because they having by the fortunes of war got some of his loyal subjects in their power, may execute them in like manner by way of retaliation. Humanity and necessity, therefore, induce him to stay his hand, and forbear to do what in the particular instance he otherwise might lawfully do. But since humanity and necessity induced this concession, it cannot be extended any further than they require, unless the sovereign so expressly declares.. And such was precisely the case and course with the United States in the late rebellion. Insurgents who were captured and fully and fairly tried and convicted of piracy and sentenced by the courts for the crime, were not executed, but exchanged as prisoners of war by the government which repudiated the right of the rebels to require it. Yet it was done to save the lives of our own officers and soldiers and citizens who had been seized by the insurgents, and threatened with execution if the pirates were not released.

Humanity and necessity, and not right or justice, nor any principle of the law of nations, induced compliance with the rebel demand, for the latter would have induced acquittal as well as discharge or exchange, had they borne upon the case.

And for the same reasons, the treatment and exchange of prisoners generally was conceded and settled by cartel between the belligerents.

Thus far and to that extent, and to that extent only, did the government of the United States concede belligerent rights to the insurgents, and recognized and treated them as belligerents and not as traitors.  Indeed, it would be most unreasonable by any rule of interpretation to extend the concession further than the reason and necessity required which induced it, and further than the express terms of the cartel would allow.   Yet such would be the case to say that all the rights of belligerents in an international war were to be applied to civil war.

No cartel was ever made by which the insurgent soldier was to be relieved from responsibility in damages from any injury he might do to the person or property of any citizen whose rights were under the protection of the laws, and since no such immunity was declared or expressed, none can be presumed, since, as we have shown, no sufficient reason can be assigned for it; but on the contrary, reason and justice require otherwise.

Upon this principle it is also clear that the concession of belligerent rights, *sub modo*, and to a limited and particular extent, did not extend their operation either in effect or duration further than the reason and necessity required. Therefore, an exchange and discharge of a culprit, did not, like a pardon, discharge the guilt of the prisoner, nor bar the government from prosecuting and punishing the insurgents, or such of them as it might choose to make an example of, after the insurrection was suppressed.

And with this view accord the writers on national law, and likewise the practice of all nations; for instance: England, in her domestic wars with the Scots and Irish, and Canadian Fenian rebels.  So the United States, in putting Davis on his trial for treason and rebellion, and in pardoning all the rest of their guilt in that behalf.  For why pardon if not guilty (and if not true)?  Who of all the high-spirited and chivalrous thousands, would have accepted the boon, and acknowledged it with an oath, if it had been an insult and a falsehood, and they as innocent without it as with it?

Since writing the above I have seen the newspaper reports of the speech of Hon. Reverdy Johnson, delivered before the Supreme Court of the United States, in the case of *Virginia* vs. *West Virginia*, and the opinion of Chief Justice Chase, concurred in by the district Judge, Brooks, at Raleigh, North Carolina, delivered in the case of *Shortridge & Co.* vs. *Macon.*

And Mr. Johnson, in the speech referred to, states to the court that made the decision in the *Prize cases,* what he understood that decision to mean, without correction or suggestion of error in his construction from the court; and since it so accords with the views I have long entertained of that case, and as bearing on this case, it may be referred to as tending to show the proper and recognized construction of the *Prize cases,* which have been pressed and strained very hard to countenance the rebel pretension to belligerent rights and personal immunity. He said: "My impression is that the decision in this respect has been misunderstood. I understand the court as holding that if the war terminated in the success of the government, that the parties engaged in it, although treated as enemies during the conflict in order to mitigate its horrors, might then be treated as traitors."

Again, "All I suppose that the court meant was, that upon the grounds of humanity during the progress of the war, the insurgents were to be considered as enemies, but that when defeated by the total suppression of the rebellion, they became subject to the laws of the country, and might be punished under them."

The opinion of Chief Justice Chase also corroborates many of the views and conclusions above expressed; among others, that the government at no time acknowledged or recognized the self-styled Confederacy.

That the national Government constantly asserted sovereign rights and jurisdiction over the people and States in insurrection; that the belligerent rights were concessions by the government to the rebels, by cartel, &c., for the sake of humanity—the Chief Justice says: "Those who engage

in rebellion must expect the consequences. If they succeed, rebellion becomes revolution, and the new government will justify its founders. If they fail, all their acts, hostile to the rightful government, are violations of law, and originate no rights which can be recognized by the courts of the nation whose authority or existence have been alike assailed. We hold, therefore, that compulsory payment under the sequestration acts to the rebel receiver of the debt due to the plaintiffs from the defendant, was no discharge." And he also distinguishes between international and civil war, in respect to the suspension of interest on a debt—admitting the suspension in the former, but not in the latter.

He also controverts the construction given there and here to the decision in the *Prize cases*, and asserts that "there is nothing in that opinion which gives countenance to the doctrine which counsel endeavor to deduce from it; that the insurgent States, by the act of rebellion, and by levying war against the nation, became foreign States, and their inhabitants alien enemies."

"This proposition being denied, it must result that in compelling debtors to pay to receivers, for the support of the rebellion, debts due to any citizen of the United States, the insurgent authorities committed illegal violence, by which no obligation of debtors to creditors could be cancelled or in any respect affected."

From the foregoing, I am led to the conclusion that the plaintiff in error is not justified by the facts stated in his pleas, or in either of them, in committing the trespasses complained of; that his acts were unlawful and a violation of the rights of the defendants in error, who, being under the protection of the government and laws, are entitled to the redress which the laws afforded for the injury sustained, as in all other cases of like character arising between two citizens; and that those facts, however formally pleaded, cannot justify the trespass, nor bar the action.

I am of opinion, therefore, to affirm the judgment, with costs and damages to the defendant in error.

LOOMIS, J. I fully concur in the opinion just announced. In none of the pleas is it averred that the appellant in committing the trespasses complained of, was at the time acting from compulsion, against his will, or while under duress. The averment that he "was a soldier in the service of the Government called the government of the Confederate States of America," cannot be considered as meaning or implying that he acted involuntarily as such soldier—in the absence of apt and positive words to that effect. It is neither claimed in the argument nor is there anything in the pleadings tending even to show that his becoming a soldier in the rebel army was not a voluntary act on his part, or that he did not voluntarily place himself in a position to become the subject of those orders and commands of his superior officers, which he now pleads in justification of his acts.

Much of the conflict of opinion that exists among the learned counsel as to the rights and immunities of rebels under the law of nations, arises mainly, I think, from a failure to recognize the fact that international law, though based upon principles of humanity—though breathing a sound and wise policy, and though affording valuable guides to governments in their political departments, yet lacks some of the essential characteristics pertaining to municipal law as technically understood, in this: it is not a rule of action prescribed by a superior to an inferior, which the latter is bound to obey. Sovereign nations may adopt or reject it at pleasure, and in actual practice never hesitate to do so. To the great credit however of christian and civilized nations be it said, that even in rigorous prosecution of their wars they seldom make flagrant departures from the humane principles recommended so forcibly by the great writers on international law; but this is not proof of compulsion on their part to recognize and obey it.

If the *policy* of foreign nations constitutes supreme law, then courts must ever remain in uncertainty as to their respective statutes, for these are to be controlled and modified by a constantly varying policy. Our legislation must be

interpreted by the light of opinions prevailing under forms of government differing from ours; opinions, too, depending in a great measure for their stability on the interest and ambition of rulers. But whatever may be claimed as good policy for the government of armies, *pendente bello*, or whatever political powers a nation may choose to exercise, these are not subjects for courts to consider in their efforts to expound the law.

The citations from the various writers on international law in support of the proposition that the same rules and practices governing the conduct of armies at war between *different nations*, apply equally in *civil wars*, most clearly refer to the period of actual hostilities, and this, for the reason assigned, namely: in order to mitigate the horrors of war, and relieve it as much as is possible from its terrible enormities. The reason for the observance of the principles of humanity and forbearance, exists the same in civil, as in national wars. But the conduct of the victorious party towards the conquered enemy after the war has terminated, may be very different in the one case from the other.

After a war between two nations is over, the private soldier of the conquered nation is not held accountable by the victor for legitimate acts of warfare, although such acts would amount to trespass, theft, robbery or murder, if done in a time of peace, because these acts having been done in obedience to the commands of his sovereign, while engaged in war, he would, if held accountable for them afterwards, appeal to his sovereign for protection; the sovereign would demand his discharge, and if refused such refusal would be just cause for a renewal of hostilities.

The soldiers constituting the armies of a *foreign nation*, at war with us for example, owe allegiance to their sovereign and are compelled to obey his commands whether willingly or not; on no principle of justice then can they be held personally accountable for legitimate acts of warfare, because by force of their rightful allegiance they are without option in the premises.

But in the present case of an unsuccessful rebellion no such reasons exist. The insurgents were acting in violation of express law from the beginning, and though during the actual continuance of hostilities they were treated with that forbearance generally observed between different nations at war, but now when hostilities have ended, and the so-called Confederacy ceases to have an existence, and the chief insurgents are in prison or held at the mercy of the rightful government, that government may deal with the privates and officers of the rebellion as to it may seem proper; it may pardon the former, and rightfully hang the latter; may punish either or both, or grant amnesty to all. This it may do in the exercise of its sovereignty. In vain would the rebel soldier call upon his annihilated government for protection; in vain would he expect a renewal of hostilities by his rebel chief if the victorious government persisted in holding the insurgents personally accountable for their treason. Hence it is plain that the *policy* of a nation in dealing with those who have been at war, or in revolt against it, is modified by circumstances; and courts cannot give interpretation to laws, and shape private rights so as to conform with an ever varying political policy. Laws to be of value must be certain, and of a nature to be understood. The existence of war may cause the execution of the civil laws to be temporarily suspended, but they are not thereby abrogated. The forbearance and moderation of a nation during hostilities, cannot be afterwards construed into a relinquishment of rights that existed before the war, nor an acknowledgement of the justice of the enemies' cause.

If the facts set up in these pleas amount to a justification of the trespasses complained of, then loyalty to the government and fidelity to the laws, occasion positive danger to the citizen in times of great public commotion. The insurgents secure immunity to themselves, in proportion as their numbers are formidable, their deeds unlawful, and as they increase their own necessities for converting the private property of unoffending citizens. While they are few in number, and their deeds of lawlessness limited, they are re-

garded as thieves, robbers, or murderers, and treated accordingly. But when their numbers are so multiplied as not to be quelled by the local authorities, their depredations and atrocities so vast as to create a wide-spread terror in the land, then it is maintained they are to be treated with consideration—entitled to respect if successful in their resistance to the rightful authority, and because of the enormity of their crimes, and the magnitude of their numbers are not even to be held responsible for private wrongs done to private persons and property. If this be the true rule, the peaceful private citizen may be plundered without redress, for he must submit to the loss, if the rebellion succeeds, and the law affords him no remedy if it fail.

When the courts of the country shall maintain the doctrine claimed by the plaintiff in error in these cases, they offer a premium to treason, and beset the pathway of peace and loyalty with difficulty and danger.

MAXWELL, J. concurred in the judgment of the court.

JUDGMENT AFFIRMED.