Marshall, Ch. J.,
delivered the opinion of the court.— This is a claim for a cargo of coffee, &e., which, after being shipped from a port in Santo Domingo, in possession of the brigands, was captured by a *160 French privateer, and carried into Barracoa, a small port in the island of Cuba, where it was sold by the captor. The cargo, having been brought by the purchaser into the state of South Carolina, was libelled in the court of admiralty, by the original American owner. The purchaser defends his title, by a sentence of condemnation, pronounced by a tribunal sitting in Santo Domingo, after the property had been libelled in the court of this country ; and by an order of sale made by a person styling himself delegate of the French government of Santo Domingo, at St. Jago de Cuba. The great question to be decided is — Was this sentence pronounced by a court of competent jurisdiction?
At the threshold of this interesting inquiry, a difficulty presents itself, which is of no inconsiderable magnitude. It is this : — Can this court examine the jurisdiction of a foreign tribunal ?
The court pronouncing the sentence, of necessity, decided in favor of its jurisdiction ; and if the decision was erroneous, that error, it is said, ought to be corrected by the superior tribunals of its own country, not by those of a foreign country. This proposition certainly cannot be admitted in its full extent. A sentence, professing on its face to be the sentence of a ju*269] dicial tribunal, if rendered by a self-constituted *body, or by a body not empowered by its government to take cognisance of the subject it had decided, could have no legal effect whatever.
The power of the court then is, of necessity, examinable to a certain extent by that tribunal which is compelled to decide whether its sentence has changed the right of property. The power under which it acts must be looked into; and its authority to decide questions, which it professes to decide, must be considered.
But although the general power by which a court takes jurisdiction of causes must be inspected, in order to determine whether it may rightfully do what it professes to do, it is still a question of serious difficulty, whether the situation of the particular thing on which the sentence has passed, may be inquired into, for the purpose of deciding whether that thing was in a state which subjected it to the jurisdiction of the court passing the sentence. For example, in every case of a foreign sentence condemning a vessel as prize of war, the authority of the tribunal to act as a prize court must be examinable. Is the question, whether the vessel condemned was in a situation to subject her to the jurisdiction of that court, also examinable? This question, in the opinion of the court, must be answered in the affirmative.
Upon principle, it would seem, that the operation of every judgment must depend on the power of the court to render that judgment; or, in other words, on its jurisdiction over the subject-matter which it has determined. In some cases, that jurisdiction, unquestionably, depends as well on the state of the thing, as on the constitution of the court. If, by any means whatever, a prize court should be induced to condemn, as prize of war, a vessel which was never captured, it could not be contended, that this condemnation operated a change of property. Upon principle, then, it would seem, that, to a certain extent, the capacity of the court to act upon the thing condemned, arising from its being within, or without their jurisdiction, as well as the constitution of the court, may be considered by that tribunal which is to decide on the effect of the sentence.
*161 *Passing from principle to authority, we find, that in the courts of England, whose decisions are particularly mentioned, because we are best acquainted with them, and because, as is believed, they give to foreign sentences as full effect as are given to them in any part of the civilized world, the position, that the sentence of a foreign court is conclusive with respect to what it professes to decide, is uniformly qualified, with the limitation, that it has, in the given case, jurisdiction of the subject-matter.
This general dictum is explained by particular cases. The case of The Flad Oyen, 1 Rob. 114, was a vessel condemned by a belligerent court, sitting in a neutral territory ; consequently, the objection to that sentence turned entirely on the defect in the constitution of the court. The Christopher, 2 Rob. 173, was condemned, while lying in the port of an ally. The jurisdiction of the court passing the sentence was affirmed, but no doubt seems to have been entertained, at the bar, or by the judge himself, of his right to decide the question, whether a court of admiralty, sitting in the country of the captor, could take jurisdiction of a prize lying in the port of an ally. The decision of the tribunal at Bayonne, in favor of its own jurisdiction, was not considered as conclusive on the court of admiralty in England, but that question was treated as being perfectly open, and as depending on the law of nations. The case of The Kierlighett, 3 Rob. 82, is of the same description with that of The Christopher, and establishes the same principle.
In the case of The Henrick and Maria, 4 Rob. 35, Sir W. Scott determined, that a condemnation, by the court of the captor, of a vessel lying in a neutral port, was conformable to the practice of nations, and therefore, valid; but in that case, the right to inquire whether the situation of the thing, the locus in quo, did not take it out of the jurisdiction of the court, was considered as unquestionable. *The case of The Comet, 5 Rob. 255, stands on the same principles.
The Helena, 4 Rob. 3, was a British vessel captured by an Algerine corsair, owned by the Dey, and transferred to a Spanish purchaser, by a public act, in solemn manner, before the Spanish consul. The transfer was guarantied by the Dey himself. The vessel was again transferred to a British purchaser, under the public sanction of the judge of the vice-admiralty court of Minorca, after that place had surrendered to the British arms. On a claim in the court of admiralty, by the original British owner, Sir W. Scott affirmed the title of the purchaser, but expressed no doubt of the right of the court to investigate the subject.
The manner in which this subject is understood in the courts of England, may then be considered as established on uncontrovertible authority. Although no case has been found, in which the validity of a foreign sentence has been denied, because the thing was not within the ports of the captor, yet it is apparent, that the courts of that country hold themselves warranted in examining the jurisdiction of a foreign court, by which a sentence of condemnation has passed, not only in relation to the constitutional powers of the court, but also in relation to the situation of the thing on which those powers are exercised ; at least, so far as the right of the foreign court to take jurisdiction of the thing is regulated by the law of nations and by treaties. There is no reason to suppose, that the tribunals of any other country whatever deny themselves the same power. It is, therefore, at *162 present, considered as the uniform practice of civilized nations, and is adopted by this court as the true principle which ought to govern in this case.
In pursuing the inquiry, then, whether the tribunal erected in St. Domingo was acting on a case of which it had jurisdiction when The Sarah was condemned, this court will examine the constitutional powers of that tribunal, the character in which it acted, and the situation of the subject on which it acted.
*Admitting that the ordinary tribunal erected in St. Domingo was capable of acting as a prize court, and also of taking cognisance of offences against regulations purely municipal, it is material to inquire, in which character it pronounced the sentence of condemnation in the case now under consideration.
In making this inquiry, the relative situation of St. Domingo and France must necessarily be considered. The colony of St. Domingo, originally belonging to France, had broken the bond which connected her with the parent state, had declared herself independent, and was endeavoring to support that independence by arms.. France still asserted her claim of sovereignty, and had employed a military force in support of that claim. A war de facto, then, unquestionably, existed between France and St. Domingo. It has been argued, that the colony, having declared itself a sovereign state, and having thus far maintained its sovereignty by arms, must be considered and treated by other nations, as sovereign in fact, and as being entitled to maintain the same intercourse with the world that is maintained by other belligerent nations. In support of this argument, the doctrines of Vattel have been particularly ref erred to. But the language of that writer is obviously addressed to sovereigns, not to courts. It is for governments to decide, whether they will consider St. Domingo as an independent nation, and until such decision shall be made, or France shall relinquish her claim, courts of justice must consider the ancient state of things as remaining unaltered, and the sovereign power of France over that colony as still subsisting.
It is not intended to say, that belligerent rights may not be superadded to those of sovereignty. But admitting a sovereign, who is endeavoring to reduce his revolted subjects to obedience, to possess both sovereign and belligerent rights, and to be capable of acting in either character, the manner in which he acts must determine the character of the act. If, as a legislator, he publishes a law ordaining punishments for certain offences, which law is to be applied by courts, the nature of the law, and of the proceedings under ,...,1 it, will ^decide whether it is an exercise of belligerent rights, or ex * clusively of his sovereign power ; and whether the court, in applying this law to particular cases, acts as a prize court, or as a court enforcing municipal regulations.
Let the acts of the French government which relate to this subject be inspected. The notification given by Mr. Pichón, the French chargé d'affaires to the American government, which was published in March 1802, interdicts all manner of intercourse with the ports of St. Domingo, in pos-,» session of the revolted negroes, and declares that “ cruisers will arrest all foreign vessels, attempting to enter any other port, and to communicate with any of the revolted negroes, to carry either ammunition or provisions to them. Such vessels,” he adds, “ shall be confiscated, and the commanders *163 severely punished, as violating the rights of the French republic, and the law of nations.”
It might be questioned, under this notice, whether vessels sailing on the high seas, having traded with one of the brigand ports, would be considered as liable to seizure and to confiscation, after passing the territorial jurisdiction of the government of St. Domingo. A free trade with that colony had been allowed, and the revocation of that license is made known to the government of the United States. To its revocation, the ordinary rights of sovereignty alone were sufficient. The notification, however, refers to the order of the commander-in-chief of the French republic in St. Domingo ; and that order would, of course, be examined, as exhibiting more perfectly the extent and the nature of the rights which the French Republic purposed to exercise. The particular order which preceded this notification is in these words : “ Every vessel, French or foreign, which shall be found by the vessels of the republic, riding at anchor in the ports of the island, not designated by these presents, or within the bays, creeks and landing-places on the coast, or under sail at a less *distance than two leagues from the coast, and r*Q(7. communicating with the land, shall be forfeited.” ■-
The next decree is dated the 22d of June 1802, and the extract which is supposed to regulate this particular subject, is in these words : “ Every vessel, French or foreign, which shall be found by the vessels of the republic anchored in one of the ports of the island, not designated by the present decree, or in the bays, coves or landings of the coast, or under sail at a less distance than two leagues from the coast, and communicating with the land, shall be arrested and confiscated.”
Nothing can be more obvious than that these are strictly territorial regulations, proceeding from the sovereign power of St. Domingo, and intended to enforce sovereign rights. Seizure for a breach of this law is to be made only within those limits over which the sovereign claimed a right to legislate, in virtue of that exclusive dominion which every nation possesses within its own territory, and within such a distance from the land as maybe considered as a part of its territory. This power is the same in peace and in war, and is exercised according to the discretion of the sovereign. The prohibition and the penalty are the same, on French and foreign vessels.
This subject was again taken up in October 1802, in an arréte, which in part regulates the coasting trade of the island. The 4th, 5th and 6th articles of this decree respect foreign as well as French vessels, and subject them to confiscation in the cases which are there enumerated. These are all of the same description with those stated in the arreie of the 22d of June ; and no seizure is authorized but of vessels found within two leagues of the coast.
The last decree is that which was issued by General Ferrand on the 1st of March 1804. This deserves the more attention, because it is that on which the courts profess to found their sentence of condemnation, in the particular case under consideration, and because General *F errand uses expres- r¡| sions which clearly indicate the point of view in which all these arrutes *- ° were contemplated by the government of the island. The title of this ctrrUe is, “ An arrute relative to vessels taken in contravention of the dispositions of the laws and regulations concerning French and foreign commerce in the colony.” In stating the motives for this ordinance, it is said, “ That some French agents in the neighboring and allied islands had mistaken the applica *164 tion of the laws and regulations concerning vessels taken in contravention, upon the coasts of St. Domingo occupied by the rebels, and had confounded those prizes with those which were made upon the enemy of the state.” “Desiring to put an end to all the abuses which might result from this mistake, and which would be as injurious to the territorial sovereignty as to the rights of neutrality,” the commander-in-chief, after some further recitals, which are not deemed material, ordains the law under which the tribunals have proceeded.
The distinction between seizures made in right of war, and those which are made for infractions of the commercial regulations established by the sovereign power of the state, is here taken in terms ; and that legislation, which was directed against vessels contravening the laws and regulations concerning French and foreign commerce in the colony, is clearly of the latter description. The first article of this ordonnance is recited in the sentence, as that on which the condemnation is founded. It is in these words : “ The port of Santo Domingo is the only one in the colony of St. Domingo that is open to the French and foreign commerce; in consequence, all vessels anchored in the bays, harbors and landing places on the coast occupied by the rebels; those cleared for the ports in their possession, coming out with or without a cargo, and generally, all vessels sailing in the ^ territorial extent of the island (except that from Cape Raphael to *Oeoa 8 bay), found at a distance less than two leagues from the coast, shall be detained by the state vessels and privateers having our letters of marque, who shall conduct them, if possible, into the port of Santo Domingo, that the confiscation of the said vessels and cargoes may be pronounced.”
As this article authorizes a seizure of those vessels only which are “ sailing within the territorial extent of the island, found within less than two leagues of the coast,” it is deemed by the court to be sufficiently evident, that the seizure and confiscation are made in consequence of a violation of municipal regulation, and not in right of war. It is true, that the revolt of the colony is the motive for this exercise of sovereign power. Still, it is an exercise of sovereign power, restricting itself within those limits which are the province of municipal law, not the exercise of a belligerent right.
The tribunal professing to carry this law into execution, though capable of sitting either as a prize or an instance court, must be considered, in this case, as acting in the character of an instance court, since it is in that character that it punishes violations of municipal law.
The Sarah was captured more than ten leagues from the coast of St. Domingo, was never carried within the jurisdiction of the tribunal of that colony, was sold at Barracoa, in the island of Cuba, and afterwards condemned as prize, under the arréte of General Ferrand, which has been stated.
If the court of St. Domingo had jurisdiction of the case, its sentence is conclusive. If it had no jurisdiction, the proceedings are coram, nonjudice, and must be disregarded. Of its own jurisdiction, so far as depends on municipal rules, the court of a foreign nation must judge, and its decision must be respected. But if it exercises a jurisdiction which, according to the law of nations, its sovereign could not confer, however available its sentences may be within the dominions of the prince from whom the authority is ,. , derived, they are not regarded *hj foreign courts. This distinction is -* taken upon this principle, that the law of nations is the law of all *165 tribunals in tbe society of nations, and is supposed to be equally understood by all.
Thus, the sentence of a court sitting in a neutral territory, and instituted by a belligerent, has been declared not to change the property it professed to condemn; and thus, the question whether a prize court, sitting in the country of the captor, could condemn property lying in a neutral port, has been fully examined, and although the jurisdiction of the court in such case was admitted, yet no doubt appears to have been entertained of the propriety of examining the question, and deciding it according to the practice of nations. Since courts, who are required to decide whether the condemnation of a vessel and cargo by a foreign tribunal has effected a change of property, may inquire whether the sentence was pronounced by a court which, according to the principles of national law, could have jurisdiction over the subject, this court must inquire whether, in conformity with that law, the tribunal sitting at St. Domingo, to punish violations of the municipal laws, enacted by its sovereign, could take jurisdiction of a vessel seized on the high seas, for infracting those laws, and carried into a foreign port.
In prosecuting this inquiry, the first question which presents itself to the mind is, what act gives an inchoate jurisdiction to a court ? It cannot be the offence itself. It is repugnant to every idea of a proceeding in rem, to act against a thing which is not in the power of the sovereign under whose authority the court proceeds; and no nation will admit that its property should be absolutely changed, while remaining in its own possession, by a sentence which is entirely ex, parte. Those on board a vessel are supposed to represent all who are interested in it, and if placed in a situation which requires them to take notice of any proceedings against a vessel and cargo, and enables them to assert the rights of the interested, the cause is considered as being properly heard, and all concerned *are parties to it. But the owners of vessels navigating the high seas, or lying in port, cannot *- take notice of any proceedings which may be instituted against those vessels in foreign countries ; and consequently, such proceedings would be entirely ex parte, and a sentence founded on them never would be, and never ought to be, regarded.
The offence, then, alleged to have been committed by The Sarah, could not be cognisable by the court of St. Domingo, until some other act was performed, which should make the owners of the vessel and cargo parties to the ¡proceedings instituted against them, and should place them within the legitimate power of the sovereign, for the infraction of whose laws they were to be confiscated. There must, then, be a seizure, in order to vest the possession of the thing in the offended sovereign, and enable his courts to proceed against it. This seizure, if made either by a civil officer, or a cruiser acting under the authority of the sovereign, vests the possession in him, and enables him to inquire, by his tribunals constituted for the purpose, into the allegations made against, and in favor of, the offending vessel. Those interested in the property which has been seized are considered as parties to this inquiry, and all nations admit that the sentence, whether correct or otherwise, is conclusive.
Will a seizure de facto, made without the territorial dominion of the sovereign under cover of whose authority it is made, give a court jurisdiction of a thing never brought within the dominions of that sovereign? This is *166 a question upon -which considerable difficulty has been felt, and on which some contrariety of opinion exists. It has been doubted, whether proceedings, denominated judicial, are, in such a case, merely irregular, or are to be considered as absolutely void, being cor am nonjudice. If merely irregular, the courts of the country pronouncing the sentence were the exclusive judges of that irregularity, and their decision binds the world ; if coram nonjudice, the sentence is as if not pronounced.
It is conceded, that the legislation of every country is territorial; that beyond its own territory, it can only affect its own subjects or citizens. It is not easy to conceive a power to execute a municipal law, or to enforce obedience to that law, without the circle in which that law operates. A power to seize for the infraction of a law, is derived from the sovereign, and must be exercised, it would seem, within those limits which circumscribe the sovereign power. The rights of war may be exercised on the high seas; because war is carried on upon the high seas ; but the pacific rights of sovereignty must be exercised within the territory of the sovereign.
If these propositions be true, a seizure of a person, not a subject, or of a vessel, not belonging to a subject, made on the high seas, for the breach of a municipal regulation, is an act which the sovereign cannot authorize. The person who makes this seizure, then, makes it on a pretext which, if true, will not justify the act, and is a marine trespasser. To a majority of the court, it seems to follow, that such a seizure is totally invalid ; that the possession, acquired by this unlawful act, is his own possession, not that of the sovereign ; and that such possession confers no jurisdiction on the court of the country to which the captor belongs. This having been the fact in the case of the Sarah, and neither the vessel, nor the master, supercargo, nor crew, having ever been brought within the jurisdiction of the court, or within the dominion of the sovereign whose laws were infracted, the jurisdiction of the court over the subject of its sentence never attached, the proceedings were entirely ex parte, and the sentence is not to be regarded.
The case of The Helena, already cited, may, at first view, be thought a case which would give validity to any seizure, wherever made, and would refer the legality of that seizure solely to the sovereign of the captor. But on a deliberate consideration of that case, the majority of the court is of opinion, that this inference is not warranted by it. Several circumstances concurred in producing *the decision which was made, and those cir-J cumstances vary that ease materially from this. The captured vessel was carried into port, and while in the power of the sovereign, was transferred by his particular authority, in solemn form. In such a case, Sir William Scott conceived that a sentence of confiscation, conformable with the laws of Algiers, was to be presumed. But his decision did not turn singly on this point. The vessel, after passing in this formal manner to a Spanish purchaser, had, with equal solemnity, been again transferred to a British purchaser; and the judge considered this second purchaser, with how much reason may, perhaps, be doubted, as in a better situation than the original purchaser. This case is badly reported ; the points made by counsel on one side are totally omitted, and the opinion of the judge is not given with that clearness which usually characterizes the opinions of Sir William Scott. But the seizure was presumed to be made by way of reprisals for some breach of the treaty between the two powers, so that the possession of the *167 captor was considered as legitimately the possession of his sovereign, and from the subsequent conduct of the Dey himself, a condemnation according to the usages of Algiers was presumed.
But in presuming a condemnation, this case does not, it is thought, dispense with the necessity of one ; nor is it supposed, in presuming a legitimate cause of seizure, to declare that a seizure, made without authority, by a commissioned cruiser, would vest the possession in the sovereign of the captor, and give jurisdiction to his courts. If this case is to be considered as if no sentence of condemnation was ever pronounced, the property is not changed, and this court, having no right to enforce the penal laws of a foreign country, cannot inquire into any infraction of those laws. The property, in this particular case, was purchased under circumstances which exclude any doubt respecting its identity, and respecting the full knowledge of the purchaser of the nature of the title he acquired.
*The sentence of condemnation being considered as null and in- r*™-, valid, the property is unchanged, and therefore, ought to be recovered L by the libellants in the court below. But those libellants ought to account with the defendants for the freight, insurance, and duties on importation, and for such other expenses as would have been properly chargeable on themselves as importers ; and each party is to bear his own costs.
The sentence of the circuit court is to be reversed, and also the sentence of the district court, so far as it contravenes this opinion, and the cause is to be remanded to the circuit court for the district of South Carolina, for a final decision thereon.

 Hudson v. Guestier, post, p. 293.