Casey, Ch. J.,
delivered the opinion of the court:
The claimant in this case is a citizen of the United States, and resides in the city of Washington, in the District of Columbia. He claims to have at all times borne true allegiance to the government of the United States, and avers that he has never aided, abetted, or given encouragementto rebellion against the same. He further avers that on or about the first day of October, A. D. 1861, he was the owner of forty-eight bales of cotton stored in the city of Savannah, in the State of Georgia, and that, upon the surrender of that city to the forces of the United States, this cotton belonging to him was seized by the military, turned over to the United States cotton agent, and by him shipped to New York, and was sold and the net proceeds were paid into the treasury of the United States.. He prays a judgment under the 3d section of the act of March 12, 1863, for such net proceeds.
A number of preliminary questions are raised in regard to the admissibility of testimony, and these will be disposed of first.
In the testimony of Abraham Epstein, (record, page 2,) these several items of testimony refer to and speak of the contents of a letter which is neither produced nor duly accounted for, and they are therefore to be rejected.
The matter objected to on page 3 is brought out on cross-examination, and we refuse to strike it out.
The evidence in relation to the letter in the re-direct examination of same witness, on page 4, is rejected as incompetent. '
Three items of testimony in the deposition of Elias Einstein, on page 6, printed record, are objected to because they refer to the contents of letters not produced or accounted for j theobjection is sustained, and this testimony is ruled out.
*6 Also an item on page 3, in Einstein’s testimony. We think this competent evidence, as it does not appear to have been by letter, and we therefore overrule the objection.
The conversation between the witness Waxelbaum and Einstein, on page 32, record, is objected to. We think it competent. It was afterwards substantially communicated to Gross-meyer by the witness, and is a legitimate part of the history of the transaction.
The defendants also, by their special counsel, moved to strike out the entire deposition of Elias Einstein, who, it is alleged, is the vendor of the cotton; or, if not, is interested in the event of the suit, and therefore in either aspect incompetent, by reason of the Act of June 25, 1868, § 4; that section provides, "That no plaintiff or claimant, or any person from or through whom .any such plaintiff or claimant derives his alleged title, claim or right against the United States, or any person interested in any such title, claim or right, shall be a competent witness in the Court of Claims in supporting any such title, claim or right, and no testimony given by such plaintiff, claimant or person, shall be used:”
The counsel for the government contends that the j>erson who sold the cotton to the claimant comes within the rule of exclusion mentioned in the act, as the person through whom the claimant derives title, claim, or right against the United States. We do not think this view of the law can be sustained. Admitting Einstein to be the vendor of the cotton, he does not come "within the letter, the spirit, or intention of the act. Three classes are excluded:
1st. The claimant or plaintiff of record.
2d. Any person through whom such claimant or plaintiff derives the claim or right he is seeking to enforce against the United States, in the suit in hand.
3d. Or any person who has an interest in the event of the suit.
Now it must be apparent that a vendor of personal property, against whose title there is no allegation or suspicion, and who transferred it to another in good faith, can have no interest in a suit brought by his vendee to recover that property of its proceeds, against one who, after the sale was complete, converted it to his own use without lawful authority. This proposition as applied to the situation of the witness, Einstein, I think, will *7 not be denied. If I am too confident in that expression, I still believe it cannot be refuted.
But Are think the error arises from not distinguishing between the person from whom a claimant derives his title to the property, which aftenrards becomes the foundation for the claim, and the claim itself; the vendor of the former is not excluded, the assignor of the latter is. If the United States seize the house or ship of one man, and he transfers it then to another, this latter brings suit for the property, or its price, his vendor is excluded, because he is then the person through whom the claimant derives his claim or titlej or right against the United States. But between that case and ours the distinction is as broad as the highway. He is not the claimant. The claim has not been derived through him. The transfer of the property was perfect and complete, if Grossmeyer has any claim at all, long before its seizure. Grossmeyer’s claim against the United States is derived from that seizure alone, and not from Einstein’s transfer of the cotton.
Has he any interest"? is the only remaining inquiry. Gross-meyer’s claim rests upon the fact that his title was complete before the seizure. The proof is, that he and Einstein have settled for the cotton, and that Einstein has been paid for it. Such would, we think, be the effect of Grossmeyer’s claim here. After claiming the proceeds of this cotton he would, in a suit between Einstein and himself for the price of it, be estopped from denying his purchase, and his liability for its \*alue. And whatever the event of this suit, it could not affect his rights as against Grossmeyer. This leaves him free from valid objection as a Avitness, and Ave refuse to suppress his deposition.
On the merits of this case Ave find the folioAving facts. Prior to the rebellion, the claimant, Grossmeyer, Avas a resident of the city of Hew York. Elias Einstein, a friend of his, resided and Avas engaged in business in Macon, in the State of Georgia. Grossmeyer had on several occasions advanced money to Einstein for the purchase of cotton on joint venture, and also advanced various sums to him as loans. At the breaking out of the rebellion there were several thousand dollars due from Einstein to Grossmeyer. By a Avitness, Waxelbaum, Avho jmssed back and forth several times betAveen Macon and New York, the parties communicated with each other. Grossmeyer directed Einstein to pinchase cotton for him with the money in his hands, *8 or that he owed him, and hold it for him until after the war. Einstein made a purchase of 48 bales, sent notice back by Waxelbaum that he had done so, and after some time shipped it to Epstein, to Savannah, and directed him to have it stored for Grossmeyer. He placed it in a warehouse in Savannah, but not in the name of Grossmeyer, as he swears it would have been seized and confiscated by the rebel authorities had he done so. This cotton remained in Savannah until its capture by Sherman’s army in December, 1864. It was then, with the other cotton found in that city, shipped to New York, to Simeon Draper, the cotton agent, and was sold, and the net proceeds were paid into the treasury of the United States. These net proceeds amount to the sum of $8,040 96. This suit is brought to recover these proceeds, and his petition was filed on the 22d June, 1867.
The claimant has proved that he never resided at any time u where the rebel force or organization held sway; ” that he never .gave any aid orcomfort to the rebellion, and that he did, during said rebellion, consistently adhere to the United States.
The special counsel for the United States interposes several objections to the claimant’s recovery:
1st. That he has not proved his ownership, as required by the 3d' section of the act of March 12, 1863.
2d. That he has not proved his loyalty, as required by the 3d section of the act of June 25,1868, and March 12,1863.
3d. That the claim not having been preferred in the Court of Claims within two years after the suppression of tiie rebellion, it is barred by the limitation contained in the 3d section of the act of March 12, 1863.
I. The act conferring jurisdiction upon this court in. relation to. abandoned or captured property, or the recovery of the proceeds of it by loyal owners, designates the proof that shall be made. The ownership and other requirements, in order to authorize a recovery, are to be proved to the satisfaction of the Court of Claims. This we have not construed as conferring upon us an arbitrary authority, but only the right to exercise a sound and legal discretion. In the case of Margaret Bond v. The United States, (2 C. Cls. R., p. 532,) referring to this clause, the court says: “This we hold to mean that the facts shall be established by legal and competent testimony, in the same manner that is usually practiced in courts of justice; that such testi *9 mony shall be taken before a competent officer or magistrate, on legal notice to the solicitor of the United States, under the solemnity of an oath, and subject to a cross-examination under such rules as the coirnt has prescribed. The evidence of ownership of the property required is at least equal to that necessary to sustain an action of trespass or trover. The ownership must be a bona fide one, not collusive or colorable.” “We hold that wherever one individual has sold and the other purchased, to prevent the property from being seized by and forfeited to the'United States, the ownership is not genuine.” To the principles here laid down we have strictly adhered. Upon a full and careful review we are satisfied with the doctrine there announced, and until we shall be further directed or instructed will be compelled to apply the same rules to the cases that may arise.
To the principle that unchallenged and continued possession of personal property, ivith a claim of title to it, is prima facie evidence of ownership, I know of no exception. And in trespass or trover, in respect of such chattels, it being uncontra-dicted or rebutted by any countervailing evidence, is conclusive.
Here we have the direction of Grossmeyer to Einstein to make the purchase. We have the notification of Einstein, after making the purchase, to Grossmeyer, and the latter’s consent and approval of it. We have the fact that it is shipped and directed to be stored for the use of Grossmeyer, and that it was so done.
The United States afterwards seize it in the name of Gross-meyer, and ship and sell it. We think all this, unexplained and uncontradicted, is proof of ownership, and should be “ to the satisfaction” of any court that bases its decisions upon the ordinary probabilities of human testimony. We therefore hold that he has proved that he was the owner of the property in question.
II. Does the proof of his loyalty come up to the requirements of the acts of Congress? On this subject the Act of March 12, 1863, § 3, requires that he shall prove to the satisfaction of this court “ that he has never given any aid or comfort to the present rebellion.” The Act of June 25, 1868, § 3, provides “that whenever it shall be material in any suit or claim before any court to ascertain whether any person did or did not give any aid or comfort to the late rebellion, the claimant or party asserting the loyalty of any such person to the United States during *10 sucb rebellion shall be required to prove affirmatively that such person did, during said rebellion, consistently adhere to the United States, and did give no aid or comfort to persons engaged in said rebellion; and the voluntary residence of any such person in any place where, at any time during such residence, the rebel force or organization held sway, shall be prima facie evidence that such person did give aid and comfort to said rebellion, and to the persons engaged therein.”
This latter act, it is alleged, has imposed additional and much more stringent conditions of recovery than the act of 18G3.
We have been unable to view the act in that light. We do not think that the act of 1868 imposes any new conditions of recovery. If it did, it would he obnoxious to the charge of being either an ex post facto, or a retrospective statute. In the one case it would be unconstitutional, in the other unjust. And before any court is justified in coming to either conclusion, or giving to the law a construction which will lead to the one or the other, it must be convinced that the words and terms used admit of no other interpretation. (See Dw. on Stat. 536,540; Churchill v. Crease, 5 Bingham, 178, and Torrington v. Hargroves, id., 492.) In Rex v. Smith and others, Dougl. 141, it was held that “ it cannot be presumed that the statute was to have a retrospect, so as to take away a right of action which the plaiutiff was entitled to before the time of its commencement.” And see Attorney General v. Lloyd, 3 Atk., 541; Same v. Andrews, 1 Ves. Sen., 225.
This is the settled doctrine of the Supreme Court of the United States, (McEwen v. Bulkley, 26 How., 242; Harvey v. Tyler, 3 Wall., 329.) But we do not think that the act can, in accordance with the settled rules of interpretation, be held to have intended to introduce in the trial of these cases new grounds of forfeiture, new conditions of recovery, or new rules of evidence, by any enactment contained in this 3d section of the act of 25th June, 1868. If it laid either additional grounds of forfeiture, or imposed new conditions of recovery, both operating as punishishment for past offences, it would be a direct infraction of the Constitution. In the case of ex parte Garland, (4 Wall., 333,) the Supreme Court hold, that “exclusion from the practice of the law in the Federal courts, or from any of the ordinary avocations for past conduct, is punishment for such conduct. The exaction of the oath was intended only to ascertain upon whom the act is intended to operate.” And is not the disability to sue *11 in a Federal court, imposed for past conduct, a punishment for a past offence ? The evidence required would be the mere mode of ascertaining the person upon whom this ex post facto penalty is to be inflicted; nor can it be said that it merely affects the power and jurisdiction of the court to render a judgment in favor of such a person. The disability, if it exist, is not in the court, it is in the party. But in our judgment the act contemplates no new penalty, nor any essential change of the evidence required, to authorize a recovery under the act of 1863, but to extend the same mode and measure of proof to all cases and all courts where the loyalty or disloyalty of any person may be in question. Every section in this law is made to apply specially, and in direct terms, to the Court of Claims, and to it alone, except this third section. And by this, instead of changing to any extent either, the mode or measure of proof heretofore required in these cases, in this court, Congress has adopted our rules, given them the sanction of positive law, and extended them to all the other courts of the country. It was of the utmost importance there should be a general and uniform rule throughout the United States. The question is recurring every day, in all parts of the country, as to the loyalty of persons. What it consisted in had not before been defined in any authoritative manner. Different persons and different courts had different standards. Some required more, others less proof, to establish loyalty. To obviate this diversity and uncertainty, Congress has interposed and presented a just and uniform standard to which all must conform. Under the act of 1863 the condition of recovery was that he should prove “that he had never given any aid or comfort to the rebellion.”
Does the act of 1868 impose any other condition as a ground of restoration of the proceeds of his captured property i I do not so read the statute. It says, “ Whenever it shall be material, in any suit or claim before any court, to ascertain whether any person did or did not give any aid or comfort to the late rebellion.” This is the fact to be proved. This is the groundwork of the forfeitures and disabilities. . And here there is no change of that. But the mode of establishing thisleading prominent fact is for the first time pointed out and directed. And inasmuch as the fact that the party “never gave any aid or comfort to the rebellion” is a pure negative, and therefore incapable of direct proof, it is to be established by certain affirmative *12 and positive sentiments and conduct in tbe party, and by the necessary and natural presumptions arising from them. When, under the act of 18G8, it is proved that the person whose loyalty is in question “ did during said rebellion consistently adhere to the United States,” and, under that of 1863, that “he never gave any aid or comfort to the rebellion,” has he not in effect proved all that both acts require ? Is not aid to persons engaged in the rebellion aid to the rebellion itself? Does not the major include the minor ? Is not aid to the rebellion equally aid to the persons en gaged in it ? Would not .the undoubted proof of these two essential and leading requisites, in the absence of all countervailing facts, be at least inferential and presumptive proof that he never gave any aid or comfort to persons engaged in rebellion ? We think a loyal man, like a truthful or honest one, ought to have the benefit of his general good conduct and character. In every doubtful case it ought to weigh in his favor. It would be unnatural, as well as cruel, to infer and believe that a man residing in the rebel territory, and who, through all the dangers and persecutions of the war, against all the promptings of interest, and the ihfluence of friends and circumstances, had “consistently adhered to the United States,” yet had all the time been secretly guilty of treason.
Nor do we think that offices and acts of affection or humanity, rendered by persons to individuals engaged in rebellion, come within the interdictions of these acts. The laws are said to be silent amid the clash of arms. But there is a law in man’s higher and better nature which is always heard above the din of war. It is the law of human pity and sympathy; without this the Christian becomes a savage, and man a monster. Those men and women who, from motives of humanity and charity, on the battle-fields and in the hosxfitals, ministered to the weary and the wounded, the sick and the dying of the rebel and the Union soldiers alike, I think were not guilty of “ giving aid and comfort to the rebellion or to the persons engaged therein” within the meaning of these acts, although through those ministrations many rebel soldiers may have been restored to the ranks of the insurrectionary forces. The “aid or comfort” denounced in these acts is such as forfeits a man’s property, outlaws him from the courts of his country, to which loyal men have free access, deprives him of rights which they enjoy, and stamps him as guilty of at least .incipient treason. Such legal conse *13 quences never flow from .innocent motives and conduct. Tbe “aid or comfort” whicli is visited with such disqualifications and penalties, are not mere indifferent facts, but vicious -and criminal acts. To constitute them such they must have been committed with the intention and for the purpose of aiding the rebellion, and promoting its power and success, or from other improper motives. To do any act which tended to support the rebellion, where no other motive is apparent or proved, is evidence of bad intention; for every man is presumed to intend the natural result of his actions. But where the whole conduct and life of a man has been consistent with his allegiance to his country, and a single act of a doubtful motivéis presented, and which may have resulted from fear, affection, or humanity, his character, his general character for loyalty, should turn the seal-".
Taxes paid where the rebel authority held sway, contributions levied and payment extorted by the presence of a power and force that -would compel submission, would all be “aid or comfort to the rebellion, orto persons engaged therein.” But they were not wilful breaches of allegiance and duty, and therefore in our opinion do not come within the letter, the reason, the spirit or purpose of these enactments. These laws are penal, and did not intend to punish other than wilful transgression.
We mustnot be understood, in anything here said, as relaxing the rigid requirements of the law in relation to the proof of the allegiance and conduct of the claimant during the rebellion. The law was not made for that large class wdio always endeavor to be safe whichever side may win. The late rebellion was a struggle for national life or death; a venture in which the whole future of the nation rvas embarked. There was no middle ground which a citizen could properly occupy. “ He that was not for us was against us.” Neutrality was opposition, and indifference a crime. He who risked nothing in the conflict has little claim to share in the fruits of the victory. Against all such the law operates with inexorable severity; we do nothing in its administration to mitigate or avert the punishment it inflicts upon offenders. But those who risked the losses, incurred the persecutions, and braved the dangers of true allegiance, ought not to be despoiled by their fellow victors.
Much of what has been said upon the last point does not apply to the case of the claimant, Grossmayer. He was a resident of *14 the State of New York, and afterwards of the District of Columbia. He never resided where the “rebel force or organization held sway,” hence the presumptions do not ar'se against him. If they have any place they are in his favor. But, in addition he proves clearly and satisfactorily his loyal disposition and conduct. And on that subject his case is free from all doubt, tried even by the tests which the counsel for the United States insists upon applying to parties in these cases.
III. One more important question remains to be considered, and that arises on the limitation prescribed in the Aot of Congress of March 12,1863, § 3. It is' as follows: “And any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims.” The petition in this case was filed on the 22d June, 1867. The United States interpose the plea of the statute; the question therefore arises whether the claim was preferred in this court within two years after the suppression of the rebellion. The fact to be determined, therefore, is, when was the rebellion suppressed? In regard to a foreign war, commenced by a formal declaration and ended by articles or treaty of peace, the state of war or peace is determined by those events, and admits of little question. But in a civil war or insurrection, where no such declaration or treaty obtains, there is more difficulty. It is sometimes impossible to designate, as matter of fact, the point of time, the day or hour, where the one condition of society ends and the other begins. The encroachments of usurped power may have been so gradual as to render it difficult to specify the exact time when the rightful authority of government has been displaced. And the reestablishment of the civil authority, by means of military force and operations, may be so slow and regular as to leave no well defined boundary where the one ends and the other begins. For a time, in all such'cases, the civil and military hold and exercise divided sway. And this interval does not belong exclusively to either war or peace. War is no longer flagrant, but peace has not been completely restored. Can, however, the rebellion be said to have been suppressed until the civil power is reinstated? The confusion and disorder that prevailed in the rebel States after the surrender of the insurgent armies was a part of the rebellion itself. And it was as necessary to *15 remedy and reform these as it was to overcome the armed forces, before the reign of peace, and law and order could be restored. And until that was done it could not be said “the rebellion was suppressed.” This state of things existed all over the insurrectionary States, at and after the surrender of Lee and Johnson. In some places the disorder and confusion was worse than in others. In some communities this condition lasted longer, while in others it was of shorter duration. These facts greatly enhance the difficulty of deciding, as an independent and substantive fact, when the rebellion was actually suppressed. If left to be so decided in any case as it arises, no uniformity could be expected in the different comts, nor, indeed, in the same courts. Different courts and juries and witnesses would look at the question under different aspects and from various stand-points. Their opinions would be affected and varied from their localities, their personal bias or prejudice, or from surrounding circumstances. It appears evident to me that Congress intended there shordd be a single date from which the limitation in all cases of the designated cla^s should commence to run. This intention would be utterly defeated by the interpretation contended for.
Between this statute and ordinary acts of limitations there is a marked and peculiar difference. Ordinarily such enactments are made to operate upon individual and isolated cases. The limitation is measured in each case by its own facts. Here the limitation is made to operate upon a whole class of cases alike; not from any fact existing in any of the cases themselves, but dating from an incident in the history of the nation, and this incident or -fact not marked in point of time by anything precise or definite. These difficulties are greatly magnified when we consider the large communities, the great extent of territory affected by the rebellion, and the slow and gradual means by which it was finally suppressed.
These and many other considerations convince me that Congress never intended to impose the duty of decidir g the question upon us or upon any other court. “ The suppression of the rebellion” describes a political condition, and not a judicial fact. That condition can only be defined and determined by the political departments of the government: and their decision is not only binding but conclusive upon the judiciary. It resolves itself into a question of peace or war; and the right to make the one and declare the other are among the express and enum- *16 eratecl constitutional prerogatives of Congress. No special mode of exercising this power is prescribed by the Constitution. Hence it may be in any way not forbidden by that instrument. War may be commenced by a direct legislative act; or the acts of the President leading to open hostilities may be recognized and adopted. The effect in either case is the same. Such was the case when, by the act of May 13,1846, Congress declared that war existed by the act of Mexico. This was held to be a full sanction of the President’s acts, by which the battles of Palo Alto and Besaca de la Palma had occurred. (Prize Cases, 2- Black, 668.) So in the opening of the war of the rebellion, the President exercised his power under the acts of February 28,1795, and March 3,1807, to call out the militia of the States, and to use the land and naval forces of the nation to put down resistance to the laws, and to suppress the insurrection. This was done by proclamation of loth April, 1861, and 'on the 19th and 27th of the same month a blockade of the southern ports was declared. By a forth er proclamation on May 3,1861, a number of volunteer regiments were called out, and the regular army increased. Still another proclamation, on May 10,1861, declared martial law on the coast of Florida, and authorized certain military commanders to suspend there the writ of habeas corpus. All these acts were done prior to the meeting of Congress. When Congress convened on the 4th July following, these acts of the President were promptly ratified and adopted. One of the first of the measures of Congress was the act of July ,13, 1861, “ To provide for the collection of duty on imports,” &c. In the 5th section of this act it is provided, that under the conditions and exigencies therein recited, “it shall and may be lawful for the President, by proclamation, to declare that the inhabitants of any State, or any section or part thereof, where such insurrection exists, are in a state of insurrection against the United States,” (12 Stat. L., p. 257.) By the 6th section of the Act 20 July, 1861, (12 Stat. L., p. 281,) Congress defines in advance what shall be considered a “ suppression of the rebellion,” by declaring that the enlarged military establishment created by the act is “to be for service during the existing rebellion; and within one year after the constitutional authority of the government of the United States shall be re-established, and organized resistance to such authority shall no longer exist,” then the military establishment may be reduced, &c. By a supplement *17 to the act of July 13, 1861, above recited, approved July 31, 1861, Gongress enacted, “that the power of the President to declare the inhabitants of any State, or any part thereof, in a state of insurrection, as provided in the 5 th section of the act to which this is an addition, shall extend to and include the inhabitants of any State, or part thereof, where such insurrection against the United States shall be found by the President at any time to exist.” (12 Stat. L., p. 284.)
By the 3d section of the act of August' 6, 1861, (12 Stat. L., p. 326,) these acts, orders, and proclamations of. the President-are approved, legalized, and made valid, the same as if they had been done under the express authority and direction of Congress. Again, by the 2d section of the act of June 7,1862, (12 Stat. L., p. 422,) the President is again authorized by Congress, by proclamation, to “ declare in what States and parts of States said insurrection exists.” Prior to this act, on the 12th May, 1862, the President had, by proclamation, declared the ports of New Orleans, Beaufort, and Port Boyal open, and the blockade removed, “ except as to persons, things, and information contraband of war.”
In pursuance of the act of June 7,1862, above recited, the President issued his proclamation, dated July 1,1862, designating certain States and parts of States, and declaring that they “are now in insurrection and rebellion, and by reason thereof the civil authority of the United States is obstructed,” &c. (12 Stat. L., p. 1266.)
By the emancipation proclamation of January 1,1863, the President again designates the States, or parts of States, in rebellion. (12 Stat. L., p. 1269.)
On September 15, 1863, by proclamation, the writ of habeas corpus was suspended throughout the United States. (13 Stat. L., p. 734.)
December 8, 1863, the President issued an amnesty proclamation to such as should return to their allegiance, &c. (13 Stat., p. 737.)
July 5, 1864, by a special proclamation, martial law was declared in Kentucky, and the writ of habeas corpus suspended. (13 Stat. L., p. 743.) And by a subsequent proclamation, October 12, 1865, martial law was declared at an end in the same State, and to be no longer in force. (13 Stat. L., p. 773.)
So by proclamation of November 19,1864, the blockade of *18 Norfolk, Fernandima and Pensacola was raised after December 1,1864, except "as to contraband of war.” (13 Stat. L., p. 750.)
February 8,1865, a joint resolution of Congress excluded from tbe electoral college Virginia, South Carolina, North Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, Texas, Arkansas, and Tennessee. The proclamation of the 10th May, 1865, (13 Stat. L., p. 757,) recites that “ armed resistance to the authority of this government in the insurrectionary States may be regarded as virtually at an end, and the persons by whom that resistance, as well as the -operations of insurgent cruisers was directed, are fugitives or captives.”
On May 22,1865, another proclamation opened the ports east of the Mississippi, and removed restrictions on trade, except uin contraband of war, &c. (13 Stat. L., p. 758.)
May 29,1865, the President issued an amnesty proclamation, excluding from its benefits fourteen enumerated classes of persons, and recites that to the end “that the authority of the government of the United States may be restored, and that peace, order, and freedom may be established,” &c. (13 Star. L., p. 758.)
On the same day a military or provisional governor was appointed for the State of North Carolina. The proclamation recites that the rebel organized and armed forces have “been almost entirely overcome,” but the rebellion has, in its revolutionary progress, “now deprived the people of North Carolina of all civil government,” &c. (13 Stat. L., p. 760.)
A proclamation in the same words appointed a provisional governor, &c., for Mississippi. (13 Stat. L., p. 761.)
By proclamation June 13,1865, (13 Stat. L., p. 763,) all restrictions upon trade east of the Mississippi river are removed, except “ as to contraband of toar.” The rebellion in Tennessee is declared to be suppressed, and the disabilities and disqualifications upon the inhabitants of that State are removed, but not to impair “ existing regulations for suspension of habeas corpus, anidthe exercise of military law in cases where it shall be necessary for the general public safety and welfare during the existing insurrection.” (13 Stat. L., p. 763.) June 17,1865, by two proclamations provisional governors for Georgia and Texas, and June 21, 1865, for Alabama in the same words almost as that of North Carolina and others above recited. (13 Stat. L., p. 767.) On June 23,1865, the blockade is removed from the ports, and they opened on the *19 terms recited in proclamation of May 22, 1865, excepting contraband of war.”
May 24,1865, restrictions on trade west of tbe Mississippi river removed, except u as to tbe transportation thereto or therein on private account of arms, ammunition, all articles from which ammunition is made, gray imiforms and gray cloth,” &c. (13 Stat. L., p. 769.) June 30,1865, and July 13,1865, provisional governors appointed for South Carolina and Florida respectively. (13 Stat. L., i). 770-1.) By a proclamation dated August 29,1865, former proclamations are so modified as to allow articles contraband of war to be token into the rebel States, u under such regulations as the Secretary of the Treasury might prescribe.” (13 Stat. L., i). 772.) December 1, 1865, the suspension of the writ of habeas corpus revoked, except as to the States of Virginia, Kentucky, Tennessee, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, Arkansas and Texas, •the District of Columbia and the Territories of New Mexico and Arizona. (13 Stat. L., p. 774.)
On April 2, 1866, the President issued a proclamation declaring that u the insurrection which existed in the States of Georgia, South Carolina, Tennessee, Alabama, Louisiana, Arkansas, Mississippi, and Florida, is at an end and is henceforth so to be regarded.” (14 Stat. L., p. 811.)
August 20,1866, the President issued a final proclamation, in Avliich he recited former proclamations, and declares the insurrection in Texas at an end, and adds, “ And I do further proclaim that the said insurrection is at an end, and that peace, order, tranquillity and civil authority now exist in and throughout the whole of the United States of America.” (14 Stat. L., p. 817.)
By the act July 24, 1866, Tennessee was readmitted into the Union, and it was enacted that the State of Tennessee is hereby restored to her former proper, practical relations to the Union, and is again entitled to be represented by senators and representatives in Congress. On July 16, 1866, (14 Stat. L., p. 173,) the act “ to establish a bureau for the relief of freedmen,” &c., of the 3d of March, 1865, was continued in force for two years from the date of the latter act, and by the 14th section, pp. 176-7, it is provided “ That in every State or district where the ordinary course of judicial proceedings has been interrupted by the rebellion, and until the same shall be fully restored, and in every State or district whose constitutional relations to the govern *20 ment have been practically discontinued by tbe rebellion, and until sucb State shall be restored in such relations, and shall be duly represented in Congress of the United States,” certain rights are secured to all citizens without respect to race or color, or previous condition of slavery. And until the State is so restored, military protection and jurisdiction overall such questions are conferred and extended through the officers of the bureau.
The Act March 2,1867, (14 Stat. L., p. 428,) entitled “An act to provide for the more efficient government of the rebel States,” recites in the preamble, “ Whereas no legal State governments or adequate protection for life or property now exist in the rebel States of Virginia, North Carolina, South Carolina, Georgia, Mississippi, Alabama, Louisiana, Florida, Texas, and Arkansas ; and whereas it. is necessary that peace and good order should be enforced in said States until loyal and republican State governments can be legally established.” Then, by the enactments, the rebel States named are to “ be divided into military districts, and made subject to the military authority of the United States,” &c. This condition of things is to continue in the respective rebel States until certain prescribed conditions shall have been complied with, and they severally be entitled to representation in Congress. By an act of the same March 2, 1867, (14 Stat. L., p. 432,) Congress enacted “That all acts, proclamations, and orders of the President of the United States, or acts done by his authority or approval after the 4th of March, A. 1). 1861, and before the 1st day of July, 1866, respecting martial law, military trials by court-martial, or military commissions, or the arrest, imprisonment and trial of persons charged with participation in the late rebellion against the United States,” &c., are legalized and made valid, to the same extent and with the same effect as if said orders and proclamations had been issued and made, and said arrests, &c., had been done under the previous express authority and direction of the Congress of the United States, and in pursuance of a law thereof previously enacted, and expressly authorizing and directing the same to be done. But the act which is most directly and completely pertinent to this discussion is that of March 2,1867, (14 Stat., 422, sec. 2,) This section declares “That section 1 of the act.entitled ‘An act to increase the pay of soldiers in the United States army, and for other purposes/ approved June 20, *21 1864, be, and tbe same is hereby continued in full force and effect for three years from and after the close of the rebellion, as announced by the President of the United States by proclamation bearing date the 20th day of August, 1866.”
I have thus, at the risk of- making this opinion tedious and prolix, attempted to group the acts of Congress and the proclamations of the President which appear to me to bear more directly on this question. In this retrospect, the careful observer cannot fail to be struck with the harmony and accord of these high functionaries upon all questions relating to the rebellion and its final suppression. They have, not only by their separate but by their joint and concurrent action, most definitely and positively fixed the time. That action gives to it the force and sanction of positive law.
In the first place, every act and proclamation on this subject since the 13th of July, 1861, had the authority of that act, and of those of 31st of July, 1861, and June 2, 1862. The power conferred in those statutes to declare from time to time what States were in rebellion necessarily carried with it the power, when the rebellion was suppressed in any State or part of a State, so to proclaim it. It was a necessary adjunct of the large discretion conferred in those statutes. Accordingly we find that the President, throughout the whole period of the war, exercised this power, either with the tacit permission or express approval of Congress. Conceding to Congress alone the right to define and declare the political status of the several States in their relations to the national government, yet it will not be contended that there.is any fixed and prescribed method by which they must act. They may do it by the passage of a law j they may authorize the Executive to act for them; or, finally, they may ratify and adopt what he has already done. The effect is the same in either case. Whether in issuing the proclamations of April 2,1866, and August 20,1866, the President exercised the discretion the law vested in him wisely and well, is of no account in the case. The law conferred upón him the power to decide in the premises, and gave to no other department the right to review his decision. (See Martin v. Mott, 12 Wheat., 19; Marbury v. Madison, 1 Cranch, 137.) But in our case we have not only precedent plenary authority, but subsequent ratification and adoption, with full knowledge of what had been done. No recognition could have been more marked and *22 explicit. Act of June 20, 1864, (13 Stat. L., p. 448,) enacted, “That on and after tbe 1st May, 1864, and during the continuance of the present rebellion, tbe pay per month of non-commissioned officers and privates in tbe military service shall be as follows,” &c. It therefore became alike tbe duty and tbe interest of tbe government to define and determine when tbe increased rate of pay given by this act should cease. Tbe President bad fixed that limit on tbe 20th August, 1866. Tbe War Department adopted this proclamation, and paid tbe soldiers, at tbe lower rate, allowed before tbe act of 1864, holding that it bad expired by its own limitation. And then Congress, in this act of March 2,1867, distinctly adopts tbe 20th of August, 1866, as tbe day tbe event happened upon which tbe provision quoted from tbe a.ct of 1864 expired. And tbe law is thereupon “continued in full force for three years from and after the close of the rebellion,” as announced by tbe President in tbe proclamation already quoted, of August 20, 1866.
No direct enactment, no form of words could be more explicit and emphatic than tbe mode and manner of its adoption. Congress has made tbe proclamation its own announcement of peace. We should suppose such action would have been deemed conclusive.
Butargumentsofgreatabilityandlearninghavebeen addressed to us to show that it could not be so considered. But tbe convictions of a majority of us have not been shaken. We do not think we have any right to decide tbe question. It has been confided to other departments. They have not disagreed on tbe subject; on tbe contrary they have fully concurred. They have not neglected or refused to act, but have by their separate, their concurrent, and their joint action, united in tbe final determination of tbe question. And we have neither tbe power nor the inclination to disturb it.
Tbe only' question that remains is, whether this action of tbe political departments binds tbe courts, or whether each court before which it arises may, in either case, decide it for itself? Tbe answer to this question depends on whether tbe matter to be ascertained is a political condition or an ordinary fact. If tbe former, it is entirely outside tbe province of tbe judiciary 5 if tbe latter, it belongs to tbe court. And this must be determined from tbe nature of tbe point to be decided. In this case it is whether a civil war did or did not exist at a certain time. *23 That this is a matter for the political departments alone, and that the judiciary must follow and obey their decisions, is abundantly fortified by leading authorities in this and other countries. I shall content myself by referring to, and making citations from, the well-considered judgments of the Supreme Court of the United States upon the exact point.
In Rose v. Himely, (4 Cranch, 241,) it was held that whether a revolted colony is to be treated as a sovereign state is a political question, to be decided by governments, not by courts of justice; and the courts of the United States must consider the ancient state of things as remaining until the sovereignty of the revolted colony is acknowledged by the government of the United States.
In Gelston v. Hoyt, (3 Wheat., 246,) the decision in Rose v. Himely is affirmed, and Judge Story says:
“No doctrine is better established than that it belongs exclusively to governments to recognize new states in the revolutions which may occur in the world; and until such recognition, either by our own government or the government to which the new state belonged, courts of justice are bound to consider the ancient state of things as remaining unaltered. This was expressly held by this court in the case of Rose v. Himely, (4 Cranch, 241,”)
The same doctrine is held in the case of the United States v. Palmer, (3 Wheat., 610,) and in many other cases. In Foster v. Neilson, (2 Peters, 307,) Chief Justice Marshall said, “The duty of the judiciary is to decide upon individual rights, according to those principles which the political department of the nation has established.”
In Williams v. Suffolk Insurancee Company, (13 Peters, 420,) the court says:
“And can there be any doubt that when the executive branch of the government, which is charged with our foreign relations, shall, in its correspondence with a foreign nation, assume a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department ? And in this view it is not material to inquire, nor is it the province of the court to determine, whether the Executive be right or wrong. It is enough to know that in the exercise of his constitutional functions he has decided the question. Having done this under the respon *24 sibilities which belong to him, it is obligatory on the people and government of the Unions
In Marbury v. Madison, 1 Cranch, 139, (1 Curtis, 368,) the following language is employed:
“ By the Constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders.
“In such cases their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are'political. They respect the nation, not individual rights, and being intrusted to the Executive, the decision of the Executive is conclusive.”
In Astrom v. Hammond, (3 McLean, 107,) Mr. Justice McLean says: “ The j udiciary cannot exercise a revisory proceeding over executive duties.”
“In carrying a law into effect, the Executive must necessarily construe it, and it is not for this or any other court to say that there is error in the construction, and a different course must be pursued.” * * * * “In all matters of discretion, and in regard to the forms of proceeding, it is clear that executive acts cannot, in any form, be drawn in question by the judicial power.”
In the case of Martin v. Mott, (12 Wheat., 19, 7 Curtis, 10,) in which the power of the President, under the act of 1795, to call out the militia- in ease of invasion, or threatened invasion, was discussed, Judge Story says:
“ The power thus confided by Congress to the President is, doubtless, of a very high and delicate nature. A free people are naturally jealous of the exercise of military power, and the power to call the militia into actual service is certainly felt to be one of no ordinary magnitude. But it is not a power which can be executed without a correspondent responsibility. It is in its terms a limited power, confined to cases of actual invasion or of imminent danger of invasion. If it bé a limited power, the question arises, by whom is the exigency to be judged of and decided1? Is the President the sole and exclusive judge *25 wbetber the exigency bas arisen, or is it to be considered as an open question upon wbicb every officer to whom tbe orders of the President are addressed may decide for bimself, and equally open to be contested by every militiaman wbo shall refuse to obey the orders of the President? We are all of opinion that the authority to decide whether the exigency has arisen belongs exclusively to the President, and that his decision is conclusive upon all other persons. * * * * The law does not provide for any appeal from the judgment of the President, or for any right in subordinate officers to review and, in effect, defeat it.' Whenever a statute gives a discretionary power to any person to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those facts. And in the present case Are are all of opinion that such is the true construction of the act of 1795.”
In the case of Luther v. Borden, (7 How., 1,) the court say, after reciting the 4th section of the 4th article of the Constitution of the United States:
“Under this article of the Constitution it rests with Congress to decide Avliat government is the established one in a State. For 'as the United States guarantee to each State a republican government, Congress must necessarily decide Avhat government is established in the State before it can determine Avhether it is republican or not. And when senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal. It is true that the contest in this case did not last long enough to bring the matter to this issue, and as no senators or representatives Avere elected under the authority of the gOA’ernment of which Mr. Dorr was the head, Congress was not called upon to decide the controversy. Yet the right to decide is placed there, not in the courts.”
In the case of The Cherokees v. The State of Georgia, (5 Peters, 20,) there Avas a bill brought in in this case to restrain the State of Georgia from .enforcing the laws of the State Avithin the territory belonging, as it was alleged, exclusively to the tribe. The injunction was denied on the ground of the want of *26 jurisdiction. Chief Justice Marshall says, “A serious additional objection exists to the jurisdiction of the court. Is the matter of the bill the proper subject for judicial inquiry and decision? It seeks to restrain a State from the forcible exercise of legislative power over a neighboring people asserting their independence, their right to which the State denies.”
“ The bill requires us to control the legislature of Georgia, and to restrain the exertion of its physical force. The propriety of such an interposition by the court may well be questioned. It savors toó much of the exercise of political power to come within the proper province of the judicial department.”
In the recent case of Mississippi v. Johnson, (4 Wallace, 475,) where it was sought to restrain the President of the United States from executing the reconstruction laws, Mr. Chief Justice Chase, in delivering the opinion of the court, shows how a mere ministerial duty or function may be enforced or controlled. “Very different,” says the Chief Justice, “is the duty of the President in the exercise of the power to see that the laws be faithfully executed and among those laws the acts named in the bill.” “ The duty thus imposed is in no just sense ministerial. It is purely executive and political. An attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshall, as1 an absurd and excessive extravagance.’ ”
So, also, in the still more recent case of Georgia v. Stanton, (6 Wall, 50.) The Supreme Court of the United States refused to entertain jurisdiction, for the reason that “the case calls for a political judgment, and therefore will not be entertained by the court.”
The very point in dispute here arose and was recently decided in the Supreme Court of the State of West Virginia, in the case of Conley et al. v. The Supervisors of Calhoun Comity. (2 West Va. Rep., 416.)
On the 13th February, 1862, the general assembly of Virginia passed an act in reference to the removal of the county seat of Calhoun county, and in that provided: that it shall be lawful to open polls at the various places of voting in the county of Calhoun on the fourth Thursday in May, after the present war is over, for the purpose of taking the sense of the voters, &c. The vote was taken on the fourth Thursday in May, 1866. This *27 election tbe court held to be void, because taken before tbe war was over. Tbe court says: 1 ‘ How are we to determine that question? It is a question to be determined by tbe political department of tbe government, and not by tbe judicial.” And beld tbat tbe proclamation of August '20, 1866, was tbe end of tbe war, and tbat, being- a public act, tbe courts are bound to take judicial notice of and are concluded by it.
I cannot tbink tbat in prescribing a limitation, as Congress did, in tbe act of March 12,1863, it was intended to be an unsettled, roving, ambulatory thing; a matter to be mooted and contested in each individual case as it should arise, and therefore to depend upon tbe intelligence, means of information, or bias of tbe particular witnesses called in any case. Hence cases occurring in tbe same State, county, or neighborhood might be decided differently, according to tbe testimony in tbe particular cases. To determine tbe question by States is equally uncertain. While peace and order may have obtained in one part of a State, riot, confusion, and bloodshed may have prevailed in another. While tbe courts may have been open in one district or county of a State, in another it may have required the presence and strong arm of military power to repress tbe smouldering fires of the rebellion. Besides, what appears to me entirely inconsistent with tbe partial and piecemeal suppression of tbe rebellion, and utterly conclusive against tbat view, is tbe fact tbat war and rebellion are not stationary and local in their character and operations. So long as tbe rebellion raged in Texas and Arkansas, what security bad we tbat tbe scene of conflict and carnage would not tbe next day be transferred to Louisiana or Mississippi? And when there why not extend to Alabama and Georgia, and so kindle afresh all over tbe south tbe conflagration of civil war? But if it depended upon tbe actual existing fact, could it be shown tbat tbe rebellion was suppressed, and civil law and social order restored prior to tbe 20th of August, 1866, in Georgia or South Carolina? Can it be pretended that life and property were secured, and tbe right to pursue bis avocations, and to entertain and express bis. political views and opinions, were guaranteed to tbe citizen by tbe laws as enforced and administered by tbe courts there? So far from it, they were ruled and beld in check by military power. Had this been removed at any time prior to August 20,1866, these communities would *28 again have suffered ail the confusion and disorder resulting froni civil war. None of these communities were deemed sufficiently recovered to be admitted to their former relations with the nation until July, 1868, when their representatives and senators were admitted to Congress.
Nor do I think that the time when the courts were opened in the insurrectionary States has anything to do with the question here. This court was always open, and here was the only place the claim could be preferred. It is not a question of the commencement of the action, but when the right to bring it ends. The two years after the suppression of the rebellion were to give the loyal claimant ample time after the close of the war to inform himself of his rights, and procure the necessary evidence to sustain them.
But if we are-to have limitation on a sliding scale as to time, and ambulatory as to place, by what are these to be determined? Will it be affected by the situs of the property or the residence of the owner ? If the latter, when and how will it affect a claimant who has always resided in a loyal State? These, and many more difficulties that might be suggested, admonish us to adhere to the line of safe precedents. When we cast loose from these moorings we are at sea, without rudder or compass, and should we escape shipwreck we would be more fortunate than wise. Government, like complicated and well-adjusted machinery, while each part performs its proper and appropriate functions in the general arrangement, the movements and operations are harmonious, 'and the results legitimate and beneficial. But when any part becomes disarranged, oris made to perforin functions to which its natures and powers are not adapted, its operations become disordered and confused, and its results abortive or destructive.
A majority of the court hold that the rebellion was suppressed on the 20th day of August, 1866; and this suit having been preferred to this court within two years from that date, the claim is not barred by the statute of limitations.
It is further ordered, adjudged, and decreed here, that the claimant do have and recover of and from the United States the sum of eight thousand and forty dollars and nine'ty-six cents, ($8,040 96.)